# HOUSTON AND TEXAS CENTRAL RAILROAD COMPANY *v.* TEXAS.

ERROR TO THE COURT OF CIVIL APPEALS FOR THE THIRD SUPREME JUDICIAL DISTRICT OF THE STATE OF TEXAS.

No. 81. Argued December 13, 14, 15, 1899.—Decided March 26, 1900.

The Federal character of a suit must appear in the plaintiff's own statement of his claim, and where a defence has been interposed, the reply to which brings out matters of a Federal nature, those matters thus brought out by the plaintiff do not form a part of his cause of action.

The treasury warrants in question in this case cannot be said upon the evidence to have violated the Constitution of the United States, or of the State of Texas.

A warrant, drawn by the authorities of a State in payment of an appropriation made by the legislature, payable upon presentation if there be funds in the treasury, and issued to an individual in payment of a debt of the State to him, cannot be properly called a bill of credit, or a treasury warrant intended to circulate as money.

A deliberate intention on the part of a legislative body to violate the organic law of the State under which it exists, and to which the members have sworn obedience, is not to be lightly indulged; and it cannot prop-

erly be held that the receipt of the warrants issued in pursuance of legislative authority in Texas, and in payment of an indebtedness due the State from the individual paying them, is an illegal transaction, and amounts in law to no payment whatever.

When a municipality contracts for a municipal improvement, which it is within its power to agree for, and engages to pay for the same in bonds which it is beyond its power to issue, and the work so contracted for is done, the municipality is responsible for it in money as it cannot pay in bonds.

Where the validity of a contract is attacked on the ground of its illegal purpose, that purpose must clearly appear, and it will not be inferred simply because the performance of the contract might result in an aid to an illegal transaction.

On the principles laid down in *Baldy* v. *Hunter*, 171 U. S. 388, the contract in this case cannot be held to be unlawful.

When the officers of the State, pursuant to its statutes, received warrants as payment, they acted for the State in carrying out an offer on its part which the State had legal capacity to make and to carry out; and the contract having been fully executed by the company and the State, neither party having chosen to refuse to perform its terms, neither party, as between themselves can thereafter act as if the contract had not been performed.

THIS proceeding was commenced by the State of Texas against the defendant, the Houston and Texas Central Railroad Company, (hereafter called the company,) to recover the amount due on certain bonds issued to the State, and to foreclose the lien which existed upon its property as security for the payment of such bonds. The company is the legal successor of the two companies which received the loans and gave their bonds, and no question of liability arises on that ground. Judgment was given in the trial court for the amount found due, and a lien was declared and a sale of the property of the company ordered. From this judgment the company appealed to the Court of Civil Appeals for the State, where it was modified, and then affirmed. The company brings the case here on writ of error.

The petition of the State by which the proceeding was commenced showed that the predecessors of the plaintiff in error borrowed money from the school fund of the State and gave their bonds therefor. These bonds were not paid according to their tenor and effect, and the legislature therefore, on August 13, 1870, passed a general act for the relief of railroad

companies indebted to the State, by which it was provided that if any company should on the first day of November, 1870, pay six months' interest on the aggregate amount of the loan, which, on the first day of May, 1870, was due from it to the State, and one per centum of the principal, and thereafter should make similar semi-annual payments, the State would not exact any other payments.

(What was the aggregate amount of the loans due on the first of May, 1870, from the two companies of which the present company is the successor, is the question in controversy, and its answer depends upon the validity of certain payments made by the companies to the State in treasury warrants during the war. Part of the discussion rests upon the meaning and effect of this act, and it is, therefore, given in full in the margin.)[1]

---

[1] An act for the relief of railroad companies indebted to the State for loans from the Special School Fund.

Whereas, the political disturbances since the year 1860, by unsettling the business of the country, have largely contributed to prevent compliance on the part of railroad companies indebted to the State for loans from the special school fund, with their engagements respecting the payment of the principal and interest of said loans; and,

Whereas, it is desired to relieve said companies from the liability of their railroads to sale consequent upon their non-compliance as aforesaid: Therefore,

SEC. 1. Be it enacted by the Legislature of the State of Texas, That any railroad company indebted to the State for loans from the special school fund may avoid the sale of its railroad for the non-payment of principal or interest by the payment into the treasury of the State, on the first day of November, A. D. 1870, of six months' interest on the aggregate amount due on account of said loans, principal and interest, as said aggregate amount stood on the first day of May, A. D. 1870, and by the payment, in addition, on said first day of November of one per cent. upon said aggregate amount, to be applied toward the sinking fund provided for by existing laws in respect to said loans, and by continuing to pay into the treasury of the State six months' interest, and one per cent. on account of said sinking fund semi-annually thereafter, to wit, on the first day of May and November in each year.

SEC. 2. That if any railroad company shall fail to pay any amount required to be paid in section one of this act at the time designated thereby, or within ten days thereafter, then the whole debt of such company, principal and interest, shall become due, and the governor shall proceed without delay to cause the railroad of said company and its franchises and property, so

Subsequently, semi-annual payments of interest and sinking fund were made by or on account of the Washington County Railroad Company, (one of the predecessors of the plaintiff in error,) up to and including the first of May, 1879, but no payment was made on November 1, 1879, or at any time thereafter. Similar payments were made by or on account of the Houston and Texas Central Railway Company (the other of such predecessors) up to and including the first day of May, 1893, but a portion only of the semi-annual interest claimed to be due in November, 1893, was paid, and nothing has been paid since November, 1, 1893. Judgment was prayed for the sums of money stated to be due with interest, for the foreclosure of the lien and for a sale of the property under execution, the proceeds to be applied to the payment of the sum due with interest, and for such other relief as might be necessary.

To this petition the defendant filed an answer, and therein among other things alleged that after the commencement of the civil war the various railroad companies were unable to fulfil their obligations to the State, and therefore the legislature of Texas, on the eleventh day of January, 1862, passed an act for their relief, extending the time of payment of interest and sinking fund amounts until the first of January, 1864.

---

far as the lien or mortgage of the State covers the same, to be sold, the sale to be in all respects (when not in conflict with this act) conducted according to the provisions of the statute of August 13, A. D. 1856: *Provided, however,* That in case the governor should (for the protection of the school fund) deem it necessary, he may buy in any road to be sold under this act, in the name of the State: *Provided, further,* That if the whole principal and interest which may become due as aforesaid, and all costs attending the advertisements and proposed sale, shall be paid before the day of sale, then the proceedings for sale shall be stopped.

SEC. 3. That the State of Texas will not exact of any railroad company not hereafter in default in respect to any of the payments required in this act the payment of the principal of the debt of said company, excepting said payments on account of the sinking fund as aforesaid, but that any company may pay the same in full at any time on thirty days' notice to the governor, and that said lien or mortgage of the State shall not attach to any extension of its existing road hereafter constructed by any of said companies.

SEC. 4. That this act shall take effect from and after its passage.

Approved, August 13, 1870, p. 85, c. 63.

The state legislature, on December 16, 1863, passed the first act in relation to receiving treasury warrants from railroad companies, c. 57, which reads as follows:

" SEC. 1. Be it enacted by the Legislature of the State of Texas, That the comptroller of the State be, and he is hereby, authorized to receive from the railroad companies in this State who are indebted to the special school fund, all interest on their bonds that may now be or hereafter become due, provided the same is tendered in state bonds or in state treasury warrants, previous to the meeting of the next regular session of the state legislature.

" SEC. 2. That for all sums so paid in, the comptroller and treasurer shall issue to the special school fund the bonds of the State bearing 6 per cent. interest."

The legislature also passed another act on May 28, 1864, c. 16, which reads as follows:

" SEC. 1. Be it enacted by the Legislature of the State of Texas, That the provisions of the act of which it is amendatory shall not apply to railroad companies that fail or refuse to receive state bonds or state treasury warrants at par for freight or passage at the prices or rates established by law.

" SEC. 2. That whenever satisfactory evidence is produced or furnished to the comptroller of the State that any railroad company has failed or refused to receive the state bonds or state treasury warrants at par for freight or passage at the rates established by law, he is required to refuse to receive the state bonds or treasury warrants for the interest due by said railroad upon its bond.

" SEC. 3. That the president of any railroad in this State be, and is hereby, required to post in a conspicuous place in the railroad offices and in the passenger cars the provisions and terms of this act, under a penalty of $100, to be recovered for the benefit of the State by suit before any court of competent jurisdiction, upon information of any party."

On November 15, 1864, still another act was passed by the legislature, c. 16, which reads as follows:

" Be it enacted by the Legislature of the State of Texas, That the railroad companies of this State that are indebted

to the special school fund shall continue to be allowed the privilege of paying the interest due said fund in the treasury warrants and bonds and coupons of the State; and may also discharge the whole or any part of the principal of their indebtedness to that fund (in the same manner) provided such railroad companies shall satisfy the comptroller that the treasury warrants and bonds and coupons of the State are received by them at par with specie for freight and passenger travel.

" That all treasury warrants and bonds and coupons of the State, so received into the state treasury, shall be cancelled; and the comptroller shall issue the bonds of the State, bearing six per cent. interest to the special school fund for the amount so paid in ; and this act take effect from its passage."

Upon the passage of these various acts and in reliance upon the agreement and obligation of the State, as evidenced thereby, the two companies acquired treasury warrants upon good consideration, and after the passage of the act of May, 1864, they received treasury warrants at par in payment of freight and passenger services rendered by them to the various people who demanded the same, and they subsequently paid treasury warrants to the comptroller of the State in payment of interest due on their indebtedness, (the amounts of such payments are set forth in the answer,) and upon such payment and receipt of the warrants by the comptroller and treasurer they were cancelled as authorized and required by the above mentioned act, and thereupon the comptroller and treasurer issued the bonds of the State bearing six per centum interest to the special school fund for the amount so paid by the railroad companies in treasury warrants. By reason of all which it was alleged that a valid and binding contract between the State and the railroad companies was made, that the payments in treasury warrants should be valid payments, at their par value, upon the various loans made by the State to the companies; and it was further alleged that the payments by treasury warrants had been received by the authorities of the State and cancelled, and a credit for the amount thereof as payment given to the companies on the books of the State, and that the transaction thereby became fully executed, and

the State could not thereafter dispute or question the validity of such payments or the right of the company to the credits given it by the State.

It was also alleged that after the passage of the act of August 13, 1870, and about the first of November, 1870, the comptroller of the State, with the concurrence and approval of the governor, wrongfully and without authority of law, recharged each of the railroad companies respectively upon the books of the comptroller's office with the several amounts theretofore paid by them respectively in treasury warrants, and there was demanded from the respective companies on the first day of November, 1870, six months' interest and one per centum for the sinking fund on the aggregate amount of the loan, as made up by the comptroller, after striking out the payments made by the company with the treasury warrants. These amounts were paid under protest, as being illegally demanded and resulting in a violation of the contract existing between the companies and the State. Payments on the same basis were continued semi-annually from that time, accompanied by a protest similar to the one first mentioned, until, as the company contends, the full amount due by it to the State had been paid, provided the payments in treasury warrants were credited as valid payments. Since that time the company has refused to make further payments. It claimed that the act of August 13, 1870, as construed by the state authorities, impaired the obligation of the contract existing between the State and itself, and thereupon it prayed for judgment.

To this pleading the plaintiff filed its first supplemental petition, and therein specially set up that the three several acts of the legislature of the State, mentioned in the defendant's answer as the authority for the payment upon the bonds of the company in treasury warrants, were unconstitutional and void, because (1) the warrants in which payments were authorized to be made were issued for the purpose of being circulated as money and were in violation of the state constitution; (2) also because they were bills of credit emitted by the State, and therefore in violation of section 10 of article 1 of the Constitution of the United States; and (3) because the acts under which the

warrants were authorized to be paid, together with other acts passed at or about the same time, plainly indicated that the treasury warrants and other obligations in which payments were authorized to be made, and which were made by the defendant, were issued in aid of the rebellion against the United States of America, and were, therefore, void.

Upon these pleadings a motion was made by the company to remove the case to the United States Circuit Court, on the ground that by the filing of the plaintiff's last above mentioned pleading it became apparent for the first time, from plaintiff's statement of its own claim, that the case was one arising under the Constitution or laws of the United States, and defendant was therefore entitled to a removal. The motion was denied, and although further pleadings were thereafter served on each side, they are not material to the matters discussed in the opinion.

The case was tried without a jury, there being no dispute as to the facts. The trial court held that the payments in treasury warrants were illegal because they were issued to circulate as money, in violation of the constitution of the State. It also held that they were issued, or at least some of them were issued, in direct aid of the rebellion and were therefore void; that the burden rested with the defendant to show, if it could, which, if any, of the warrants were valid. Judgment was given in favor of the State.

The company then appealed to the Court of Civil Appeals for the Third Supreme Judicial District of the State, where the judgment was modified so as to render no personal judgment against the company, and to foreclose the lien of the State only upon that part of the road which the findings showed was in existence on August 13, 1870, and as thus modified it was affirmed, solely on the ground that the warrants were issued in violation of the state constitution, as paper intended to circulate as money. A writ of error was applied for to the Supreme Court of Texas, and by that court refused. The company then brought the case here by writ of error to the Court of Civil Appeals. The defendant in error has made a motion to dismiss the writ on the ground that this court has no jurisdiction, for reasons stated in the opinion.

*Mr. John G. Carlisle* and *Mr. R. S. Lovett* for plaintiffs in error. *Mr. J. P. Blair* and *Mr. Maxwell Evarts* were on their brief.

*Mr. Charles A. Culberson* for defendants in error. *Mr. T. S. Smith* and *Mr. M. M. Crane* were on the briefs.

Mr. Justice Peckham, after stating the foregoing facts, delivered the opinion of the court.

The motion to dismiss the writ of error must be denied. The case involves a Federal question under the contract clause of the Constitution.

The claim on the part of the defendant in error, the plaintiff below, is that the state court decided the case under the provisions of the state constitution only, and without reference to the act of 1870, which the plaintiff in error (the railroad company) alleges to be an impairment of the contract set up by it in the pleadings. Although the state court held that the payments in dispute were made by means of state treasury warrants issued to circulate as money, which were therefore void as in violation of the constitution of the State, and that the delivery of the warrants by the company amounted to no payment whatever, the question still remains whether by that decision any effect was given to the act of 1870. We think the judgment of the state court did give effect to that act.

It will be seen that the third section provides that the State will not exact of any railroad company, not thereafter in default, the payment of the principal of the debt, excepting as paid by the payments due the sinking fund under the provisions of the act; it also provides in the second section that if a railroad company failed to pay the amount required to be paid in section one, at the times designated thereby or within ten days thereafter, then the whole debt of such company, principal and interest, should become due, and the governor was directed to proceed as therein stated.

The first thing to be done in order to be able to carry out the provisions of the act was to ascertain what the aggregate amount

of the loan was, as that amount stood on the first day of May, 1870, because it was upon that amount that interest semi-annually was to be paid, and also one per centum of principal to the sinking fund. The authorities of the State determined what the aggregate amount was as it stood on the first day of May, 1870, and they arrived at that amount by refusing to recognize as valid any payment which the company had made in treasury warrants, and in that way they made the aggregate amount larger by those sums than that made by the company, which claimed to be credited with the amount of its payments in those warrants. Upon the aggregate amount, as determined by the authorities of the State, payment of the interest and for the sinking fund was demanded under the act. This demand was complied with by the company under protest, and accompanied by a claim on its part that the aggregate amount due on the loan was less than that stated by the authorities of the State by just the amount of the payments which the company had made in these treasury warrants. The protest was overruled and the claim denied, and thereafter the same protest and the same claim were made and the same action taken upon the part of the state authorities on each semi-annual occasion when payments were due and made. This lasted until the payments made by the company in cash and in the treasury warrants, upon the basis of the legality of the payments in such warrants, paid the indebtedness due from the company to the State, and from that time it has refused to make further payments. The State did not acknowledge that full payment had been made of that indebtedness, and thereupon commenced the present proceeding to recover the amount it claimed to be due and to foreclose its lien against the company. This it could not do under the statute of 1870 unless the company had defaulted in respect to the payments required under that act.

It is admitted that the company had not so defaulted, provided the payments in treasury warrants were duly credited to it, nor is it denied on the other hand that if those payments were not valid payments and ought not to be credited to the company, then it had defaulted in respect to the payments required by the act before the commencement of these proceed-

ings.   When the state court, therefore, decided that these warrants were issued in violation of the constitution of the State, and that payments in them were in fact and in law no payments, and gave judgment accordingly, the effect of that decision was necessarily to hold that the company had defaulted in respect to the payments required under the act, and that the proceedings of the State to collect the sum due were permitted by the act, and effect was thus given to such act, although not one word was spoken in regard to it in the opinion delivered in the state court.

If the railroad company had not failed to pay any amount required to be paid in section one of the act, then the proceeding herein could not have been taken, by reason of the provision contained in the third section, and it is only after a failure to pay for ten days that the second section permits the proceedings to be taken to collect the amount.   In giving judgment for the plaintiff, therefore, the court has in effect determined that the plaintiff was proceeding rightly under the act of 1870, and effect was thus given to its provisions.

The judgment of the Court of Civil Appeals gives an additional effect to the act, because by its judgment there is struck out the provision in the judgment of the trial court in regard to the lien of the State, and it has limited that lien in accordance with the third section of the act, so that it should not attach to any extension of the railroad which had been constructed since its passage.   Although that modification may be a favor to the company, it nevertheless gives effect to the act.   The company has not accepted that act so that it cannot draw in question its validity as construed by the state court, and hence no reason is shown for the granting of the motion to dismiss on that ground. The only acceptance consists in the payments made by the company to the State after its passage.   The very first payment made by the company, under the act, namely, on the first day of November, 1870, was however made while asserting the claim that payments in treasury warrants were valid and should be acknowledged and credited to the company, and upon the refusal of the state authorities to admit those payments the company paid the interest and percentage on the larger sum de-

manded by the State, under protest, that such demand was illegal and improper, and every subsequent payment was made under the same protest by the company. Payments so made show no such acceptance of the act as to prevent the company from thereafter drawing in question its validity as construed by the state authorities.

Thus we see that, although the decision of the state court was based upon the ground that the warrants in which these payments were made had been issued in utter violation of the state constitution, and were hence void, and that no payments made with such warrants had any validity, and although this ground of invalidity was arrived at without any reference made to the act of 1870, yet the necessary consequence of the judgment was that effect was thereby given to that act, and in a manner which the company has always claimed to be illegal and unwarranted by the act when properly construed. The company has never accepted such a construction, but on the contrary has always opposed it, and raises the question in this proceeding at the very outset. Upon these facts this court has jurisdiction, and it is its duty to determine for itself the existence, construction and validity of the alleged contract, and also to determine whether, as construed by this court, it has been impaired by any subsequent state legislation to which effect has been given by the court below. *Bridge Proprietors* v. *Hoboken Company,* 1 Wall. 116; *University* v. *People,* 99 U. S. 309; *Fisk* v. *Jefferson Police Jury,* 116 U. S. 131; *New Orleans Water Works Company* v. *Louisiana Sugar Refining Company,* 125 U. S. 18; *Central Land Company* v. *Laidley,* 159 U. S. 103, 109; *Bacon* v. *Texas,* 163 U. S. 207, 216; *McCullough* v. *Virginia,* 172 U. S. 102.

In this case we think we have shown that the judgment did give effect to subsequent legislation which, as construed by the state court, the company claims has impaired the obligation of the contract between itself and the State. The writ of error was therefore well brought.

The motion for the removal of this case to the United States Circuit Court was properly denied. The statement of the cause of action as contained in plaintiff's first petition did not show that the suit was one arising under the Constitution, laws or treaties of the United States.

The suit, as it appears upon the face of the petition of plaintiff, was upon the bonds given by the company for the loan of a portion of the school fund, and to foreclose the lien of the State upon the property of the company, and in the petition reference was made to the act of 1870 for the purpose of stating the amount due on the bonds for principal and interest. Nothing upon the face of this petition showed any fact upon which Federal jurisdiction could be based. The company answered by alleging certain payments in treasury warrants, which, if properly credited, would show that with the other payments that had been made there was nothing due the plaintiff on the bonds. As an answer to this defence the plaintiff set up the invalidity of the laws providing for payments in treasury warrants; that the warrants were issued by the State in violation of both the state and Federal Constitutions, and that the payments were therefore illegal and void. This was no part of the plaintiff's cause of action upon which suit was brought, and that cause of action did not in any way involve a question arising under the Constitution or laws of the United States. The defendant, therefore, made out no case for a removal to the United States Circuit Court. *Oregon &c. Railway Company* v. *Skòttowe,* 162 U. S. 490, 494; *Tennessee* v. *Union & Planters' Bank,* 152 U. S. 454; *Galveston, Harrisburg &c. Railway* v. *Texas,* 170 U. S. 226, 235.

The result of the authorities is that the Federal character of the suit must appear in the plaintiff's own statement of his claim, and that where a defence has been interposed, the reply to which brings out matters of a Federal nature, those matters thus brought out by the plaintiff do not form a part of his cause of action, but are merely a reply to the defence set up by the defendant. The review of the Federal question by this court is not thereby precluded, for it having been properly raised in the state court and decided against the contention of the party setting it up, this court may review it on error to the highest court of the State.

This brings us to the question what, if any, contract existed between the State and the company consequent upon the payments by the company to the comptroller of the State in the treasury warrants heretofore mentioned.

The company contends that by the passage of the acts of December 16, 1863, May 28, 1864, and November 16, 1864, and by its compliance with such acts and its payment of treasury warrants to the comptroller and their receipt by him and his cancellation thereof, there was an executed transaction, and an implied contract thereupon arose that such payments should remain and be regarded as valid and effectual, and that this implied contract was entitled to the protection of the Constitution of the United States, and its obligation could not be impaired by any subsequent act of the legislature of the State.

These acts have been already set forth. The company alleges that it fully complied with all of them, and that relying upon the offers thus made it paid to the State the warrants mentioned, which were received by the comptroller and cancelled, and bonds of the State for a like amount, bearing six per cent interest, were issued by him to the school fund.

The provision in the state constitution, which it is alleged was violated by the issuing of these warrants, is contained in the eighth section of article seven of the constitution of 1845, in which, among other things, it was provided, " . . . and in no case shall the legislature have the power to issue treasury warrants, treasury notes or paper of any description intended to circulate as money." The same provision is found in the constitution of Texas adopted in 1861.

It is contended on the part of the State that these warrants were issued in violation of that section of the constitution, inasmuch as they were treasury warrants intended to circulate as money.

It is stated in the opinion, delivered in the Court of Civil Appeals, "that the warrants of the State, issued during the period of the war after January 1, 1862, were intended to be used and circulated as money, and in this connection it is well to say that we are of the opinion, from all that it is shown by the record, together with various acts of the legislatures during that time, that the payments made in warrants by the railway companies upon the obligations sued upon were in warrants issued after the time we have declared they were intended to circulate as money."

The question whether the legislature so intended is one to be decided by an inspection of the act under which they were issued, and possibly by reference to the text of other acts of the legislature enacted at or about the same time. Whether an act provides for the issuing of warrants that were intended to circulate as money is in reality a question of law arising upon the construction of the legislative act, and a finding by the court that warrants issued under and by virtue of certain acts of the legislature were issued with such intention is in the nature of a legal conclusion and not a finding of fact, and therefore it can be reviewed by this court.

To prove that these warrants were so issued, reference is made to various acts of the legislature, (in addition to those above mentioned under which the payments were made by the company,) among which are the following:

The act approved February 14, 1860, which provided that when an account was presented for payment for which an appropriation had been made it was the duty of the comptroller to audit it if legal and to issue his warrant for the amount, and if there were any money in the treasury to pay the demand the comptroller was directed to issue his warrant upon the treasurer for the amount with ten per centum per annum interest, and those warrants were to be signed by the governor and indorsed by the treasurer. The act further provided that these warrants should not circulate as money, but might be assigned.

It is said that the warrants issued under this act were few, and they are not classed among the warrants in which any payments were made to the school fund. It is, of course, not contended that these warrants were intended to circulate as money, but the act was repealed in 1862, and the repealing act, while containing other provisions, omitted the provision that the warrants to be issued should not circulate as money, and that omission is regarded by counsel as suggestive of the intention of the legislature that the warrants issued under the act of 1862 should so circulate.

By the second section of that act it was provided that the comptroller on presentation of any warrant bearing interest, as well as on presentation of any other legal claim for which an

appropriation had been made, should draw a warrant on the treasury for the amount, and payment was to be made if there were any money in the treasury; but, if not, the comptroller was authorized to issue one or more warrants for the amount that might be due and payable to the party entitled to payment, or bearer, "and said warrants shall be of such proportions of the claim as may be expressly required by the holder; provided, that not more than one tenth of the whole amount may be issued in warrants of one dollar each and the balance of five dollars or more each, and said warrants shall be indorsed by the treasurer, and every interest-bearing warrant that is superseded shall be cancelled by the comptroller."

The third section of the act provided that when the warrants were presented at the treasury and paid they should be cancelled, and should not be reissued.

By the act of January 11, 1862, it was provided that treasury warrants, not bearing interest, in addition to the other provisions made for their reception in payment for lands, (including certificates therefor,) should be receivable as money in the payment of office fees, including fees for patents and land dues payable in the general land office, taxes and all other dues to be collected for the State or in its name, with exceptions therein stated.

By another act passed on the same day, January 11, 1862, (General Laws, Texas, 1862, page 38,) the treasurer and every other officer of the State and of counties who had received as public money, among other things, the treasury warrants of the State, were directed to disburse or transfer the same as money, at par, if the person or persons entitled to have a disbursement or transfer would receive such warrants as money, and officers who were authorized to receive public money were authorized and directed to receive these warrants as money, except when expressly prohibited by some other law. Treasury warrants of the State received by the treasurer thereof were not to be reissued.

Also on December 16, 1863, another act was passed, c. 60, section 2 of which reads as follows:

"A tax of one half of one per cent. shall be levied and col-

lected in kind on all specie, treasury notes of the Confederate States of America, treasury warrants of the State of Texas, and bank notes, held or owned within this State, and all foreign bills of exchange and certificates of deposit, and other evidences of money upon deposit or secured beyond the limits of the State, owned by persons residing therein, shall be known as specie, and thereon shall be levied and collected a tax of one half of one per cent. in specie."

The court below has construed these various acts, in connection " with well-known matters of history relating thereto," and considering also the character of legislation during the period of the war, as establishing the intention of the legislature that the warrants should circulate as money. It is stated in the opinion that the legislation, providing the purpose for which they could be used and the small amounts for which they could be issued, and also the size, shape and color of the warrants, together with the history of the times and the well-known depleted condition of the treasury during that period, and the scarcity of existing, reliable and available circulating medium, as money, all showed that the purpose of the various acts of the legislature was to give to the warrants issued during that time as much as possible a standing and character as money. The court therefore held that the warrants were void, as issued in violation of the constitution of the State ; the payment made in them was in law no payment ; that no contract arose between the State and the company by reason of the use made of the warrants in surrendering them to the comptroller, and that, therefore, no defence to plaintiff's cause of action was established.

These warrants were issued pursuant to appropriations made by the legislature and in payment of debts existing at the time in favor of the individuals to whom they were delivered. They were payable at once, and if there had been funds of the State in the treasury they would have been immediately paid and cancelled. It was only because there was no money in the treasury that they were not paid. The State therefore provided that they might be received in payment of taxes or dues to the State, and that its officers might disburse them in pay-

ment of its debts to any person who would consent to receive them, but that when presented to the treasurer of the State and received by him they should be cancelled.

We have been referred to no act making provision for the size, shape or color of the paper to be used for the warrants, and such size, etc., cannot be regarded as evidence of any weight as to the intent on the part of the legislature that they should circulate as money, nor does the depleted condition of the treasury or the scarcity of a circulating medium necessarily or properly induce to that conclusion. That the size of the warrant, both as to amount and shape, might somewhat facilitate a holder, upon occasion, to discharge a debt, and in that way use it as money, is not at all sufficient or indeed any proper evidence of an unlawful intent on the part of the legislature. The act of December 16, 1863, is not the slightest evidence on the subject. It simply provided for taxing specie, treasury notes of the Confederate States, treasury warrants of the State, and bank notes held or owned in the State. It also provided a tax upon foreign bills of exchange and other evidences of money on deposit or secured beyond the limits of the State and owned by persons residing therein, and provided that they should be known as specie. The fact that treasury warrants were mixed up in such an act for the purpose of taxation with specie, bills of exchange, certificates of deposit, etc., has not the slightest tendency to prove the intent that the warrants should circulate as money.

It does not seem to us that this legislation shows that the warrants were thus issued within the meaning either of the state or the Federal Constitution. The only provision looking towards a treatment of the warrants in any manner as money is the direction to the State's own officers to receive them as payment for taxes and dues to the State, and to pay them as money to such persons as would receive them in payment of the indebtedness of the State to them.

The fact that a creditor of the State, willing to receive payment in these warrants, might demand that they should be issued to him in small sums, and not in one single warrant, does not bear with great force upon the intent of the legislature that the warrants should thereafter circulate as money. It does not

show that those warrants were intended to so circulate between individuals for the ordinary purposes of society and in the general transactions of business between citizens. For the State to say that the warrants should be transferred or disbursed by its own officers, as money, if the person entitled to a transfer or disbursement from the State would receive them as money, simply amounts to a declaration that the warrants should be issued to all such persons as would accept them in payment of the debts due them from the State. To encourage such willingness the provision was made that these warrants should be receivable as money, that is, as payment for certain debts due the State, as for taxes, etc. This use of the words "as money" has, in our judgment, no further significance, and has no force for the purpose of showing the intention of the legislature to have the warrants circulate generally as money and to form a circulating medium of that kind of paper.

It must not only be that they are capable of sometimes being used instead of money, but they must have a fitness for general circulation in the community as a representative and substitute for money in the common transactions of business. This is what is meant by the expression "intended to circulate as money." These warrants were payable to the individual to whom the State was indebted, or to bearer, and were issued to a creditor of the State. That the legislature may have desired to facilitate the use of the warrants by these provisions is perhaps true. But the members of the legislature knew that to issue the warrants to circulate as money would be to condemn them from the start. That the promise should be made to receive them in payment of debts due the State would add to their usefulness and to the willingness of people to take them in payment of debts due them from the State, and that while in their hands others might receive them in payment of debts was a possibility or probability depending upon whether the person taking them had opportunity to use them to pay some of his own debts to the State. That he might on some occasion be able to so use the warrant as to enable him to thereby discharge an obligation from himself to a third person who was willing to accept it does not bring the warrant so used within

the ordinary meaning of the term money. It is not money in that sense.

The provision in the state is substantially the same as that in the Federal Constitution, in that the legislature is prohibited from issuing treasury warrants, treasury notes or paper of any description intended to circulate as money, while in the Federal Constitution the prohibition is against a State's emitting bills of credit, and the necessity exists in both that the paper shall be issued to circulate as money, in order to be in violation of either instrument. It has been held that the bills of credit prohibited by the Federal Constitution are those which were intended to circulate as money, and hence the authorities as to the meaning of that expression, when so used, are applicable here.

In *Craig* v. *State of Missouri*, 4 Pet. 410, Chief Justice Marshall, in referring to the meaning of the clause in the Constitution prohibiting a State from emitting bills of credit, said (page 432):

"The word 'emit' is never employed in describing those contracts by which a State binds itself to pay money at a future day for services actually received, or for money borrowed for present use; nor are instruments executed for such purposes, in common language, denominated 'bills of credit.' To 'emit bills of credit,' conveys to the mind the idea of issuing paper intended to circulate through the community for its ordinary purposes, as money, which paper is redeemable at a future day. This is the sense in which the terms have been always understood."

It is true the court in the *Craig* case held that the certificates authorized by the State of Missouri were void, because they were in effect bills of credit. They were issued on account of loans made from time to time to the State, and were held to have been issued to circulate as money. The court then consisted of seven members, and Mr. Justice Johnson, Mr. Justice Thompson and Mr. Justice McLean did not concur in the judgment. Mr. Justice Johnson thought that the term did not extend to certificates that bore interest and the value of which varied with each passing day; that they approximated to bills

drawn upon a fund, not to be withdrawn by any law of the State; that the promise was also to receive in payment of debts and taxes due the State, and the certificates did not depend for value upon the faith of the State only, and hence they were not bills of credit.

Mr. Justice Thompson thought they were not bills of credit for the reason, among others, that the act did not profess to make them a circulating medium or a substitute for money; it made them only receivable for taxes, etc., due the State, and those were special and limited objects not sufficient to enable the certificates to answer the purpose of a circulating medium to any considerable extent.

Mr. Justice McLean thought that to constitute a bill of credit it must be issued by a State, and its circulation as money enforced by statutory provisions. At page 454 he said: " Where a warrant is issued for the amount due to a claimant, which is to be paid on presentation to the treasurer, can it be denominated a bill of credit?" He thought not.

In the subsequent case of *Briscoe* v. *Bank of Kentucky*, 11 Pet. 257, the same question as to the meaning of the term bills of credit arose, and Mr. Justice McLean delivered the opinion of the court.

The question was whether bank notes issued by the Bank of the Commonwealth of Kentucky, declared by the state act of incorporation to be exclusively the property of the Commonwealth, were bills of credit. In the course of the opinion the judge stated, page 312 : " The terms bills of credit in their mercantile sense comprehend a great variety of evidences of debt, which circulate in a commercial country. . . . But the inhibition of the Constitution applies to bills of credit in a more limited sense. It would be difficult to classify the bills of credit which were issued in the early history of this country. *They were all designed to circulate as money*, being issued under the laws of the respective colonies."

Reference is made in the course of the opinion to *Craig* v. *Missouri* (*supra*), and to the views of the two dissenting judges (besides himself) as to the meaning of the expression, and he ends the discussion of that part of the question by referring to

what Chief Justice Marshall had said, and adding: "The definition, then, which does include all classes of bills of credit emitted by the colonies or States, is a paper issued by the sovereign power containing a pledge of its faith and designed to circulate as money."

It was held that the bank notes in question did not fill that definition. In *Woodruff* v. *Trapnall*, 10 How. 190, 205, the question was again referred to by Mr. Justice McLean in delivering the opinion of the court, and he said that the notes of the banks therein mentioned were not bills of credit, upon the authority of the *Briscoe* case. To the same effect is *Darrington* v. *Bank of Alabama*, 13 How. 12, the opinion being also delivered by Mr. Justice McLean. The State creating the bank in that case was the only stockholder, and its credit was pledged for the ultimate redemption of the notes of the bank.

The court said it was impossible to hold that bills issued by the bank came within the definition of bills of credit. *Briscoe* v. *The Bank* (*supra*) was again referred to and the definition approved, that the paper must be issued by a State, upon its faith, designed to circulate as money, and to be received and used as such in the ordinary business of life.

In *Poindexter* v. *Greenhow*, 114 U. S. 270, 283, the coupons in question were in the ordinary form, and one of them was set out in the opinion of the court, and is as follows:

"Receivable at and after maturity for all taxes, debts and demands due the State.

"The Commonwealth of Virginia will pay the bearer thirty dollars interest, due 1st January, 1884, on bond No. 2731.

"Coupon No. 20.               Geo. Rye, *Treasurer.*"

It was contended that this coupon was a bill of credit in the sense of the Constitution, because receivable in payment of debts due the State, and negotiable by delivery merely and intended to pass from hand to hand and to circulate as money.

It was in consequence of unrestrained issues of paper money by the colonial and state governments, based alone upon credit, said the court, that this clause in the Constitution prohibiting the emission of bills of credit by the States was adopted, and

the proper definition of the term was not founded on the abstract meaning of the words so as to include everything in the nature of an obligation to pay money, reposing on the public faith and subject to future redemption, but was limited to those particular forms or evidences of debt that had been so abused to the detriment of both private and public interests.

Speaking of these particular coupons the court said :

"They are issued by the State, it is true.  They are promises to pay money.  Their payment and redemption are based on the credit of the State, but they were not emitted by the State in the sense in which a government emits its treasury notes, or a bank its bank notes—a circulating medium or paper currency —as a substitute for money.  And there is nothing on the face of the instruments, nor in their form or nature, nor in the terms of the law, which authorizes their issue, nor in the circumstances of their creation or use, as shown by the record, on which to found an inference that these coupons were designed to circulate, in the common transactions of business, as money, nor that in fact they were so used."

The fact that the coupons were receivable in payment of taxes, and other dues to the State, and hence might circulate from hand to hand as money, was held to fall far short of showing their fitness for general circulation in the community as the representative and substitute for money in the common transactions of business, which the court held was necessary to bring them within the constitutional prohibition against bills of credit.  This reasoning applies with equal force to treasury warrants.  Both classes of paper must be intended to circulate as money, and the same conditions regarding such intention and the same evidence to prove it would be necessary in each case.

In the light of these authorities, it seems to us that it cannot be properly said that the treasury warrants violated the Constitution, either of the State or of the United States, because there is no evidence that they were intended to circulate as money within the meaning of that term as already given.  The record does not show that the legislature intended that these warrants should or that they could be so used as to circulate

among the people as money, to be used by them as a paper currency or a circulating medium in their dealings with each other. Small denominations of the warrants would certainly facilitate their retirement through their use for payment of taxes and other debts due the State, and would increase their convenience for paying freight or passenger fare to the companies, which would then have an opportunity to present them to the State, in payment of interest, and as the laws did not provide for their circulation as money, but only to be received or paid by the officers of the State between the State and its debtors and creditors and to the railroad companies, as stated, it cannot be supposed from such evidence that it was the intention of the legislature that these warrants should be circulated as money, and should thus violate the provisions of the Constitution.

A warrant drawn by the state authorities in payment of an appropriation made by the legislature, where the warrant is payable upon presentation, if there be funds in the treasury, and which has been issued to an individual in payment of the debt of the State to him, cannot, as it seems to us, be properly called a bill of credit or a treasury warrant intended to circulate as money. Although the State directed its officers to receive the warrants as money, in payment of certain dues to the State, and to deliver them to those who would receive them as money in payment of dues from the State to such persons, yet, as we have already remarked, this direction was only another mode of expressing the idea that, as between the State and the individual, the delivery of the warrant should operate as a payment of the debt for which the delivery was made. When the warrants once came back to the treasurer of the State, they were not to be reissued. The decisions of this court have shown great reluctance, under this provision as to bills of credit, to interfere with or reduce the very important and necessary power of the States to pay their debts by delivering to their creditors their written promises to pay them on demand, and in the meantime to receive the paper as payment of debts due the State for taxes and other like matters.

If any fair doubt could arise, it should be solved in favor of the validity of the paper. There must be an intention on the

part of the legislature that the paper should circulate as money. There must, in other words, be an intention to violate the constitution.

A deliberate intention on the part of a legislative body to violate the organic law of the State under which it exists and to which the members have sworn obedience, is not to be lightly indulged. The existence of such intention should be proved beyond doubt or cavil from the very acts themselves which are under discussion, and if it be reasonably possible to so construe them as to render them valid, a proper respect for the legislative department calls for such construction rather than one which invalidates them, because they were enacted with a direct purpose to violate the state constitution.

But if for the purpose of this argument it should be assumed that the warrants, although issued to those who were the creditors of the State and in payment of the debts due from the State to those creditors, were nevertheless issued to circulate as money, and therefore in violation of the constitution, it cannot be properly held, in our opinion, that the receipt of such warrants pursuant to legislative authority and in payment of an indebtedness due the State from the individual paying them is an illegal transaction and amounts in law to no payment whatever.

The State was debtor to the individuals to whom the warrants were first issued in payment of that indebtedness, and all that can be said is that it violated the law by giving this particular form to the instrument by which it assumed to pay its debt. Surely if for that reason the delivery of the warrants constituted no payment, the State would have the right to make such payment in some other way. If, by reason of the violation of the constitution, its direction to the treasurer to pay the warrant was void, and no action could be maintained upon the warrant, by reason of its invalidity, (aside from the fact that the State would not be suable,) there is certainly nothing to prevent the State from recognizing the debt it actually owed, and which it assumed to pay by issuing these warrants. That recognition may be contained in the very law which authorizes their issue or in some other law. When, therefore, it passed the statutes providing that the warrants should

be received in payment of taxes and other dues to it, and also by the comptroller in payment of the interest and sinking fund due from the railroad companies to the State, and when by virtue of such authority the state officers actually did receive the warrants for such payments, we see no illegality in the payments, and it seems to us that credit therefor should be given accordingly.

Suppose that the State, intending to issue these warrants to circulate as money, had paid them through its officers to its creditors, and had then become convinced that the warrants were a violation of the constitution of the State and ought not to have been issued. Could not the State say to the creditors to whom these warrants had been paid, if you will give them back we will pay you in a form that is not a violation of the constitution? Would anybody suspect that surrendering these warrants to the State and receiving other warrants in their stead, in a form which did not violate the constitution, would be an illegal act on the part of the State? The original warrants having been issued to various creditors of the State, and they very likely having transferred them to others, wherein would consist the illegality if the State offered to and did receive those warrants from such others and paid their amount in valid obligations? Instead of paying their amounts in valid obligations, where is the invalidity if the State offers to receive them and to cancel obligations which the party owes to it to an amount equal to their face value? All this is but another way of paying the indebtedness which the State originally owed to the individuals to whom it issued these warrants, and when it cancels obligations due to it of an amount which equals the face value of the warrants, and receives the warrants in return, the legal effect is the same as if the warrants had never been transferred by the persons to whom they were originally issued, and they had brought them back to the State, and the State had given in exchange for them some valid evidence of indebtedness.

It seems to us that the same principle is involved as was enforced in *Hitchcock* v. *Galveston*, 96 U. S. 341, 350, where a city had contracted with the plaintiffs for the improvement of its sidewalks, and agreed to pay for the same in bonds which it

was beyond the power of the city to issue. It was held that the invalidity of that promise was no reason why the city should not pay for the benefits which it had received from the performance of the contract. The court said: "If payments cannot be made in bonds because their issue is *ultra vires*, it would be sanctioning rank injustice to hold that payments need not be made at all."

Suppose in that case the bonds had been issued by the city in violation of its ·charter? Could not the city thereafter, upon discovering its inability to make such a contract, receive the bonds back and make payment in some other way? Or could it not have received the bonds as a payment to that extent of an indebtedness due from their holder to the city?

Unless such transactions be legal, then it follows that the State could obtain the property or labor of the individual and pay therefor in an obligation which it had no right to issue, and which it could on that account subsequently repudiate and then deny all liability to pay at all. The character of the transaction is not altered by the transfer of these warrants from the original holder to other parties, and the State has full power to recognize in favor of the bearer of the warrants, the validity of the debt which they originally represented, and to pay the same by allowing a credit to their bearers up to the value of the warrants. We see nothing in morals or in law which should prevent the State from recognizing and liquidating the indebtedness which was due from it and which was represented by the warrants.

The other theory would prevent the State from ever redeeming warrants in form invalid, but which had been issued in payment of debts due from the State to persons receiving them.

If payments such as were made in this ·case were not valid, but absolute nullities, then any person who used the warrants to pay his taxes with, although they were received by the collector and an acquittance given, was nevertheless liable to pay those taxes again. Such consequences ought not to follow from the fact that the form of the warrant in which the payment was made rendered the warrant itself illegal as issued in violation of the Constitution.

Their receipt by the state officers from the railroad company as directed by the legislature is also justified, as appears by the case of *Little Rock* v. *National Bank*, 98 U. S. 308. This court held that even if the bonds mentioned therein were issued in violation of law, yet when the city accepted their surrender and redeemed them by giving other bonds in lieu of a portion and a credit on the books of the city for another portion of them so surrendered, such transaction was valid, and the holder of the bonds so given in lieu of the illegal ones, could recover on them, and also upon the credit given on the books of the city. We perceive no reason why the State could not, if it chose, receive these warrants in discharge of the debt *pro tanto* due it from the company.

The next question is whether the payments made are void because the warrants were issued, as alleged, in aid of the rebellion.

If by reason of any fact existing at the time these transactions occurred, and which appears in this record, the payments in question were not valid, and no valid contract grew out of the same, then the judgment should be affirmed, notwithstanding we differ with the court below in regard to the effect of the payment on the ground taken by that court. Until we are able to say there was a valid contract subsisting by reason of these transactions, by which payments were received as payment *pro tanto* of interest and sinking fund, we cannot be called upon to discuss the question whether any legislation subsequent to the making of the alleged contract has impaired its obligation. We must, therefore, pursue the inquiry in order to determine the existence and validity of the contract.

It is alleged that at least some of these warrants were issued in aid of the rebellion and were therefore void, and no attempted payments made in them could be recognized as legal or binding. Various acts of the legislature have been referred to which provided for the issuing of bonds in return for loans to the State for military purposes. The findings of the trial court upon the subject were as follows:

"I find that it has not been proved whether the warrants actually used in making the payments were warrants issued for

indebtedness incurred prior to the civil war or warrants issued for the State indebtedness incurred after the war began, or if of the latter class whether they were warrants issued for military purposes or for civil indebtedness, but from the circumstantial evidence I conclude that neither the railroad company nor the State discriminated as to the class of warrants the railroads received for carrying services or paid on their indebtedness, and that some of all kinds were used in making the payments.

\*      \*      \*      \*      \*      \*      \*      \*

" In reaching the foregoing conclusions of fact I have excluded from my consideration the statements made in official reports and governors' messages to the legislature, having concluded that defendant's objections that the statements contained in these papers were not admissible as evidence proving or tending to prove the facts therein stated, were good. I have also eliminated from consideration certain other evidence, as shown by explanations attached to defendant's bills of exception."

Taking these findings, it seems that some of the warrants had been originally issued for military purposes, while others had been issued for civil indebtedness. It is also to be inferred from the record that the warrants were in the hands of various people, residents in the State, from whom they had been purchased by the company for a fair and adequate consideration, or had been received by it at par in payment of freight or passenger services over its lines of road. Assuming that the warrants were invalid as having been issued in payment for services rendered, or stores received for use in aid of the rebellion, yet this contract between the State and the company had no connection with the purpose for which they were issued, nor was the consideration of the contract based in the remotest degree with reference to that purpose. The warrants were issued to other persons having not the slightest relation to the company, and in payment of an indebtedness for purposes to which the company was an entire stranger. The purpose of the company was undoubtedly, pursuant to the offers of the State made in the acts mentioned, to use the warrants in payment of what might be due for principal or interest on the bonds of the company held by the State.

There is no proof that the company received the warrants for any other purpose. No inference could properly, as we think, be drawn from the evidence that there was any intent, design or wish on its part to aid the rebellion by the acquisition of these warrants and so far as can be seen, it was a transaction in the way of the business of the company, entered into for the simple purpose of paying an indebtedness which it owed the State, and which, by these acts, the State permitted to be paid in this way. Even though portions of the warrants had been procured at less than par, of which fact there is no affirmative evidence, still the transaction on the part of the company did not thereby become one in aid of the rebellion, and upon this point we do not see that the prices which may have been paid for the warrants were material in the inquiry. The contract between the State and the company did not in any way aid the former in issuing them, nor did it aid the purpose for which the State may have desired to issue them.

Where the validity of a contract is attacked on the ground of its illegal purpose, that purpose must clearly appear, and it will not be inferred simply because the performance of the contract might possibly result in a remote, incidental and unintentional aid to an illegal transaction.

It is somewhat difficult to see how the offer to receive these warrants and their reception pursuant to the offer can be said to be illegal as based upon a consideration which looked to aiding the rebellion by its performance.

It has been held that a contract between parties resident within the lines of insurrectionary States stipulating for payment in Confederate notes, issued in furtherance of a scheme to overturn the authority of the United States within the territory dominated by the Confederate States, was not to be regarded for that reason only as invalid. Contracts thus made, not designed to aid an insurrectionary government, it was held, could not therefore, without manifest injustice to the parties, be treated as invalid. *Thorington* v. *Smith*, 8 Wall. 1; *Delmas* v. *Insurance Co.*, 14 Wall. 661.

The receipt of these warrants, like the contract to receive payment in Confederate notes, was not for that reason only

unlawful, although the State was the party that received them. The company was not an agent of the State in putting them in circulation, nor is there any proof that in fact it circulated any of them. The company did not take them for the purpose of giving currency to them, but in order to consummate a transaction which, when consummated, was simply a business one on the part of the company, and if by any possibility it could "indirectly or remotely promote the ends of the *de facto* government organized to effect a dissolution of the Union, it was without blame, except when proved to have been entered into *with actual intent* to further invasion or insurrection." *Thorington* v. *Smith*, 8 Wall. 1, 12; *Baldy* v. *Hunter*, 171 U. S. 388, 394.

A specimen of the contract condemned under the rule is to be found in *Sprott* v. *United States*, 20 Wall. 459, where the plaintiff sought to recover from the defendant the value of certain cotton which he had purchased from and paid the price in money to the Confederate government and which the Union forces took from its possession in the last days of the existence of that government. The court held that in the transaction the plaintiff gave aid and assistance to the rebellion in the most efficient manner he possibly could; that he could not have aided that cause more acceptably if he had entered its service and become a blockade runner, or under the guise of a privateer had preyed upon the unoffending commerce of his country. The plaintiff asked the court to in effect carry out his void contract with the Confederate government. That is very different from holding that these warrants were so far void that they could not form the basis of payment of debts by their holders, who had not received them from the State but had taken them in the course of business from other parties and who then offered them in payment of their debts due the State.

This whole subject has recently been gone over in *Baldy* v. *Hunter*, 171 U. S. 388, where many other cases are commented upon, and the principle of that and the other decisions of this court therein referred to would seem to hold this contract not unlawful.

But suppose these warrants were issued in aid of the rebel-

lion and were therefore void, and that the subsequent offer of the State to receive them in payment of the debt of the company, under the provisions of the legislative acts already referred to, was, while unexecuted, also void on that ground, still their actual receipt and the acquittance given were not, for that reason, void as between these parties.

A contract in aid of the rebellion has been held illegal because it belonged to that class of contracts which are *mala in se*, whose consideration is immoral and founded upon a criminal purpose. If a State were a party to such a contract it would not be void on the technical ground that it was *ultra vires* as beyond the contract making power of the State, but because of the illegal nature of its consideration. The contract would be void for the same reason that it would be void as between individuals, not because they had no capacity to make it, but because, being founded upon an illegal consideration, no court would recognize its validity or enforce its provisions. A State as a sovereignty has power generally to make contracts, unless there be some constitutional inhibition as to certain classes of contracts, and if the consideration of a particular contract is bad or immoral, the contract is illegal because of the character of its consideration, and not because the contract would be beyond the general scope and power of the State. Hence, as between the parties to it, the State might, if it chose, perform all its requirements, and if the acts of its officers were performed in obedience to legislative authority, their performance in executing the contract would be the act of the State. If, on the other hand, the constitution of the State had prohibited its officers from ever receiving anything but gold in payment of this debt of the company, a delivery of something else in assumed payment of the debt, though received as such by its officers under the authority of the legislature, would be no payment. That would be a case where the payment would be absolutely void because beyond the capacity of the State to authorize and equally beyond its capacity to ratify. It would be *ultra vires* in the strict sense of the term. In such event, it would be true that the act of the officer would be his individual act, and in no sense would he represent or bind the State by his action. Such

an attempted payment might, therefore, be regarded by any subsequent officer of the State as wholly void and ineffectual for any purpose.

The distinction between the two cases is obvious. In the one the contract is void because of the illegality of the consideration, not because of the legal incapacity of either party to make the contract, while in the other there is an entire lack of power to make it under any circumstances. When, therefore, the officers of the State pursuant to its statutes received the warrants as payment, they acted for the State in carrying out an offer upon its part which the State had the legal capacity to make and to carry out, and which it in this manner did carry out. The State in such case had the same power to carry out its contract (so far as the parties to it are concerned) as individuals would have had to carry out the same kind of a contract, and when the warrants were received by the officers acting for the State in payment of the interest, and the bonds of the State were issued to the school fund and acquittance given to the company, the transaction was finished and completed, in the case of the State, just as it would have been in like circumstances in the case of the individual, and by such action (as between the parties) the State is bound; the acts of its officers are its own acts, and it must be judged in the same way as an individual would be judged. In other words, the contract having been fully executed by the company and the State, neither party having chosen to refuse to perform its terms, neither party as between themselves can thereafter act as if the contract had not been performed, nor can the State pass any act which shall impair the obligation which springs from its performance. After the complete execution of the transaction it must be that each party thereupon and at once became possessed of certain legal rights arising from its performance. Neither party could undo what had been fully executed and completed, and the law therefore implies a contract that neither party will attempt to do so, or, in other words, the law implies a contract that the payments made shall not be thereafter repudiated or denied. Any subsequent statute of the State which repudiated or permitted the repudia-

tion of the payments would impair the obligation of the contract which the law raises from the transaction itself.

That a contract will be implied under such circumstances is stated in *Planters' Bank* v. *Union Bank*, 16 Wall. 483, 500. There the court said: "Some of the authorities show that, though an illegal contract will not be executed, yet when it has been executed by the parties themselves, and the illegal object of it has been accomplished, the money or thing which was the price of it may be a legal consideration between the parties for a promise, *express or implied,* and the court will not unravel the transaction to discover its origin."

So in this case. The illegal object was fully executed and accomplished, and upon its accomplishment and by reason of the whole transaction there arose an implied contract that the settlement should be conclusive upon all parties to it. This principle calls for no aid from the court in the enforcement of a void contract. The parties have already fully complied with all its terms, and by reason thereof the implied contract has arisen.

The State cannot now be permitted to repudiate or set aside the acts of its former officers, done in pursuance of the direction of the legislature of the State, and effectually and forever closed long before the present proceeding was commenced. As between the parties to those transactions, this cannot be done.

The action of the present officers of the State in bringing this proceeding has been undoubtedly prompted by the best motives and from a desire to promote the true interests of their State, but we nevertheless are unable to see how the proceeding can be successful without overturning those principles of law which must guide and control our judgment.

We are then brought to the question whether the subsequent legislation of the State has in any manner impaired the obligation of the contracts made by the State at the times when these various payments were made.

We have shown in the treatment of the motion to dismiss how the judgment of the court below gave effect to the subse-

quent act of 1870. In giving such effect was the obligation of the contract between the parties impaired thereby ?

If the State had passed no act, the question of contract could not have been raised in this court, the payments might have been repudiated, and the court have held them illegal, and we would have no jurisdiction to review its judgment. But the State has passed a statute, and said that if the company would pay interest and a certain proportion semi-annually upon the aggregate amount of the loan as it stood May 1, 1870, no further exaction would be made. The court has construed this to mean that if the company will pay such proportion semi-annually on the amount of the loan, to be ascertained by striking out the payments in warrants, then no default will be incurred, but if not, then it will have made default, and the act of 1870 provides in such case for proceedings to collect the amount due. We say the court below has so construed the act, and we say so notwithstanding it has not mentioned it in any such connection. It has said so, however, by implication necessarily arising from the judgment it has given when taken in connection with the provision of the act which permits proceedings only to be taken on a default, which does not exist in this case if the company be credited with these warrants as payments. By permitting the proceedings the court has necessarily construed the act as meaning that there is a default when payments are not made on the basis of the invalidity of the payments in warrants. The obligation of the contract which we hold existed between the State and the company growing out of the transactions mentioned has therefore by this construction of the act by the state court been materially impaired.

It is alleged on the part of the State that the acceptance of the treasury warrants in payment of money loaned from the school fund was a violation of the constitution of the State of Texas, as being an illegal diversion of that fund. Upon that point we agree with the court below; (which held that there was no such diversion,) for the reasons given by that court.

We have examined the various objections of the defendant in error which it has made because of the alleged failure of the

plaintiffs in error to properly bring the Federal question before the court, but we think they are not well taken.

> *We are of opinion that the judgment of the Court of Civil Appeals should be reversed and the case remanded to that court with directions to remand the case to the District Court, with directions to reverse its judgment and for further proceedings not inconsistent with the opinion of this court, and is so ordered.*

MR. JUSTICE BROWN concurring:

I concur in the conclusion of the court, but from so much of the opinion as holds that the treasury warrants in question were not bills of credit within the meaning of the Constitution of the United States, I am constrained to dissent.

It is admitted that these warrants fulfill all the conditions of bills of credit, except, as it is said, they were not intended to circulate as money. I am unable to concur in this view of the intent of the legislature. By the act of February 14, 1860, authorizing interest bearing warrants on the treasury, it was expressly provided that these warrants should not circulate as money, but might be assigned. This act was repealed, however, in 1862, by another act providing that warrants should be drawn for legal claims against the State, and payment made, if there were money in the treasury ; but if not, the comptroller was authorized to issue warrants payable to the party entitled to payment, or bearer, which warrants should be of such proportions of the claim as were required by the holder, one-tenth of the whole amount of which might be issued in warrants of one dollar each, and the residue in warrants of five dollars or more each. There was an omission in this act, which appears to me extremely significant, of the proviso of the former act that such warrants should not circulate as money. By another act, approved the following day, it was provided that treasury warrants of the State, not bearing interest, should be receivable " as money " in the payment of taxes, office fees (including fees for patents) and land dues payable in the general land office of Texas, and all other dues to be collected for the State, with

certain specified exceptions. By another act of December 16, 1863, the comptroller was authorized to receive from the railroad companies indebted to the special school fund all interest on their bonds that might be or might thereafter become due in state treasury warrants. This act was amended May 28, 1864, by providing that the act of 1863 should not apply to railroad companies which refused to receive these bonds or treasury warrants at par for freight or passage, at the prices or rates established by law.

The railway companies were thus compelled to receive these warrants as money from their patrons in order to be able to avail themselves of them in payment of interest upon their bonds. In addition to this, the warrants were in the form of bank notes, printed upon peculiar paper, such as is ordinarily used by banks for their circulating notes, and contained a brief and unconditional promise of the State to pay the amount to a party named, or bearer, and were declared on their face to be receivable for public dues.

If these facts be not decisive of an intention that these warrants should circulate as money, it is difficult to say what additional facts were needed to manifest that intent. Indeed, the opinion of the court seems to me to practically eliminate from the Constitution the provision that the States shall not emit bills of credit, as well as to overrule the opinion of this court in *Craig* v. *Missouri*, 4 Pet. 410. In that case, the legislature of the State of Missouri authorized the officers of the state treasury to issue certificates, of denominations not exceeding ten dollars, nor less than fifty cents, in the following form: " This certificate shall be receivable at the treasury of any of the loan offices in the State of Missouri, in discharge of taxes or debts due to the State, for the sum of ——— dollars, with interest for the same, at the rate of two per cent per annum from this date." These certificates were receivable at the treasury in payment of taxes, or moneys due to the State, or to any municipality, and by all officers, civil and military, in the discharge of salaries and fees of office. If simple certificates of the State, containing no promise to pay, are bills of credit, much more, it seems to me, should these obligations of the State of

Texas issued in denominations of one dollar and upwards, in the size, shape and color of bank notes, and receivable in discharge of all taxes and debts due the State, to which a forced circulation was given as between railways and their patrons, be held to be obnoxious to the same provision of the Constitution. As was said by Chief Justice Marshall in that case : " The denominations of the bills, from ten dollars to fifty cents, fitted them for the purpose of ordinary circulation ; and their reception in payment of taxes, and debts to the government and to corporations, and of salaries and fees would give them currency. They were to be put into circulation ; that is, emitted, by the government. In addition to all these evidences of an intention to make these certificates the ordinary circulating medium of the country, the law speaks of them in this character, and directs the auditor and treasurer to withdraw annually one-tenth of them from circulation. Had they been termed 'bills of credit' instead of ' certificates' nothing would have been wanting to bring them within the prohibitory words of the Constitution."

But I fully concur with the court upon the second point, that the State, having issued these warrants for a valuable consideration, having put them in circulation, having expressly authorized the railroad companies to pay them in discharge of their interest upon their bonds, and having received them without objection at the time, it is too late now to claim that they did not operate as payment. Though the warrants may have been issued without authority, it was competent for the State to recognize them, and to refuse now to admit them as payment upon these bonds appears to me a plain violation of the public faith. Upon the theory of the Court of Civil Appeals, I see nothing to prevent the State, unless there be a statute of limitations operative against it, from bringing suit against everybody who paid these warrants to the State for taxes or for dues, and recovering the amount a second time.

GALVESTON, HARRISBURG AND SAN ANTONIO RAILWAY CO. *v.* TEXAS.

Error to the Court of Civil Appeals for the Third Supreme Judicial

District of the State of Texas.    No. 82.    Argued with No. 81.    Decided March 26, 1900.

This involves precisely the same questions that have just been determined in the foregoing case, and the same judgment will, therefore, be entered.    Same counsel as in No. 81.