## DETROIT UNITED RAILWAY v. PEOPLE OF THE STATE OF MICHIGAN.

## DETROIT UNITED RAILWAY v. CITY OF DETROIT.

ERROR TO THE SUPREME COURT OF THE STATE OF MICHIGAN.

Nos. 1, 4.   Argued October 20, 1916.—Decided December 11, 1916.

Plaintiff in error, in 1900, under the Michigan Street Railway law (Laws 1867, vol. 1, p. 46; Comp. Laws 1897, c. 168), acquired by purchase certain street railway lines in the City of Detroit, with their franchises, and, soon afterwards, certain suburban lines, with their franchises. The latter lines connected with the former at the city boundary, but lay wholly within adjacent village and township territory. The franchises for the city lines had arisen through ordinances of the city, among them ordinances passed in 1889, which placed special restrictions on fares, and were accepted by the then owners of the city properties. The franchises for the suburban lines had arisen through village and township ordinances which fixed the fares upon a basis more favorable to the respective grantees. Until all were acquired by the plaintiff in error, the city properties had been owned and held independently of the suburban properties. Plaintiff in error united the properties thus acquired under one organization. Thereafter, by acts of the legislature passed in 1905 and 1907, the limits of the city were so extended that portions of the two outlying railways were embraced therein. These acts

contained no reference to existing contracts nor specific mention of street railway rights, but each provided that the territory annexed should be subject to all the laws of the State applicable to the city and to all the ordinances and regulations of the city, with exceptions not here material. This litigation resulted from the contention of the city, (which the state court sustained), that the outlying lines, in so far as they had come within the city through its extension, came also within the fare restrictions of the city ordinances of 1889.

*Held,* (1) Upon consideration of the village and township grants and the law under which they were made (Act of 1867, §§ 13, 14 and 20), that the right to charge fare as therein permitted, upon the lines covered by those grants, was a valid right of contract whose obligation could not constitutionally be impaired by subsequent state legislation.

(2) That, conceding the validity of the Acts of 1905 and 1907 as annexation acts, yet an impairment of this contractual right, resulting from the effect given to them by the decision of the state court combined with the construction of the city ordinances as contractually binding the plaintiff in error to submit to their fare restrictions on all of its lines within the city as so extended, was an impairment attributable to the annexation acts as well as to the construction of the city ordinances.

(3) Therefore, whether the agreements imported by the ordinances of 1889, when properly construed, were operative in the added city territory, was a question touching the merits of the case and not the jurisdiction of this court.

(4) That, read with the other city ordinances under which the franchises for the city lines were granted, the ordinances of 1889, in requiring one of the predecessors of plaintiff in error to carry passengers at reduced rates "over any of its lines in said city" and in requiring another to apply single fares and reduced rates "over the entire route of said company" were not intended to apply prospectively to lines which those companies might afterwards own within subsequent additions to the city.

(5) Even if such extended construction were allowable in respect of lines subsequently built under the actual or assumed authority of the ordinances of 1889, it could not be allowed in derogation of rights, privileges, and franchises—especially as to fare—arising independently under the township and village ordinances and acquired by plaintiff in error by purchase before the city was extended. Michigan Street Railway Act of 1867, § 15; Comp. Laws, 1897, § 6648, applied.

A grantee of a public grant may not be compelled to suffer the ills of a strict construction in one aspect without being accorded the benefits necessarily flowing from that construction in others.

Notwithstanding statements in *Henderson Bridge Co.* v. *Henderson City*, 141 U. S. 679, 689; 173 U. S. 592, 602, it is settled that when called upon to exercise jurisdiction under the contract clause this court must determine upon its independent judgment these questions: (1) Was there a contract? (2) If so, what obligation arose from it? and (3) Has that obligation been impaired by subsequent legislation?

162 Michigan, 460; 173 Michigan, 314, reversed.

THE case is stated in the opinion.

*Mr. Elihu Root,* with whom *Mr. John C. Donnelly, Mr. William L. Carpenter, Mr. Fred A. Baker* and *Mr. Henry L. Lyster* were on the briefs, for plaintiff in error.

*Mr. P. J. M. Hally,* with whom *Mr. Harry J. Dingeman* was on the brief, for defendants in error: ·

The Michigan Supreme Court bases its judgments solely on the meaning of the contracts existing between the parties. *People* v. *Detroit United Railway*, 162 Michigan, 460, 463, 465; *City of Detroit* v. *Detroit United Railway*, 173 Michigan, 314, 326, 327, 328.

The decision of a state court defining the meaning of a contract, without reference to a subsequent law, raises no federal question. *Detroit City Railway* v. *Guthard*, 114 U. S. 133; *Henderson Bridge Co.* v. *City of Henderson*, 141 U. S. 679; *Henderson Bridge Co.* v. *City of Henderson*, 173 U. S. 592, 608; *New Orleans Water Works Co.* v. *Louisiana Sugar Refining Co.*, 125 U. S. 18, 39.

In the present cases, the court below gave no effect to a subsequent law, but based its decision on the independent ground that the rights claimed by the plaintiff in error were not conferred by the contracts made with the villages and townships surrounding Detroit, because of other and previous obligations which had been contracted through its predecessors with the City of Detroit. The annexation

acts being unquestionably valid, the impairment, if any exists, of the contract obligations arises not from the acts, but comes as a mere incident of the legislation due to the agreements made by the parties.

The litigants are bound by the state court's construction of the contracts. *Henderson Bridge Co.* v. *City of Henderson*, 173 U. S. 592, 602. The only impairment conferring jurisdiction on this court is impairment by state law or constitution. *Knox* v. *Exchange Bank of Virginia*, 12 Wall. 379; *Lehigh Water Co.* v. *Easton*, 121 U. S. 388, 392. It is only where subsequent legislation intervenes that this court will construe the contract for itself. *Yazoo & M. V. R. Co.* v. *Adams*, 180 U. S. 41, 45; *Missouri & K. I. R. Co.* v. *Olathe*, 222 U. S. 187; *Southern Wisconsin R. Co.* v. *Madison*, 240 U. S. 457, 460, 461.

There is no denial of due process where, without denying any fundamental principle of law, a lawful tribunal in a regular way hears the parties and determines their rights. *Morley* v. *Lake Shore & Michigan Southern Ry.*, 146 U. S. 162; *Central Land Co.* v. *Laidley*, 159 U. S. 103, 112.

The court below correctly interpreted the contracts. In succeeding to their property, franchises, etc., plaintiff in error obligated itself to carry out the contracts made by its predecessors. The decisions of the court below, in interpreting these obligations, merely followed the established rule that public grants or franchises must be construed strictly against the grantee and in favor of the public—a principle established by many decisions of this court.

The continued expansion of Detroit was of common knowledge, evidenced by many acts of annexation, enacted before the plaintiff in error purchased the properties in question, and all prior to the contract of 1889. The contracting parties must have had in view the certainty that the city limits would go further. The term "city limits" in a contract to run for thirty years means the city limits as they will become. The obligations of the parties under

the contract of 1889 were intended to expand territorially as the limits grew.

MR. JUSTICE PITNEY delivered the opinion of the court.

These two cases involve identical questions, were argued together, and may be disposed of in a single opinion. They concern the rates of fare that may be charged by plaintiff in error upon certain street railway lines within the present limits of the City of Detroit, and in both cases it is insisted that the state court of last resort has given such an effect to statutes enacted in the years 1905 and 1907 for extending the corporate limits as to impair the obligation of the contracts contained in franchises theretofore granted by the governing authorities of the annexed territory to the predecessors in title of plaintiff in error.

Plaintiff in error was incorporated December 28, 1900, under the Street Railway Act of 1867 and amendments thereto (Mich. Laws 1867, vol. 1, p. 46; Comp. Laws 1897, c. 168), for the purpose, as its corporate name indicates, of acquiring, maintaining, and operating various lines theretofore constructed by other companies. Section 15 of the act (§ 6448, Comp. Laws) provides that any street railway company may purchase and acquire any street railway in any city, village, or township owned by another corporation, together with the rights, privileges, and franchises thereof, "and may use and enjoy the rights, privileges and franchises of such company, the same, and upon the same terms as the company whose road and franchises were so acquired might have done." Under this authority it shortly thereafter acquired and united under one organization certain lines previously constructed and operated independently throughout the city and its suburbs under different and distinct franchises, of which the following is a summary:

In November, 1862, the city, by ordinance, granted to the incorporators of the Detroit City Railway the right

to construct railways in certain streets, including Jefferson Avenue, which extends from the centre of the city in a northeasterly direction to and beyond the city limits. All the lines authorized were to commence at Campus Martius, and run thence on their several courses to the city limits, and the route along Jefferson Avenue to the eastern limits was to be completed within six months after March 31, 1863. In 1873 a section was added authorizing the construction of a second track along Jefferson Avenue. In 1862 the city limits on Jefferson Avenue were at Mt. Elliott Avenue. In 1885 they were extended to a point 200 feet east of Baldwin Avenue, and while they remained as thus fixed, and in the year 1889, a supplemental ordinance was passed granting to the Detroit City Railway, among other things, the right to extend its double track along Jefferson Avenue from its then present easterly terminus to the easterly city limits, and fixing a time within which the same should be constructed. There was a provision that the additional lines should be operated in connection with and as parts of the then present system of the Detroit City Railway, and that the company should agree, among other things, to make arrangements for carrying passengers between the hours of 5.30 and 7.00 a. m., and between 5.15 and 6.15 p. m., over any of its lines in the city for a single fare upon tickets sold at the rate of eight for twenty-five cents, with specified transfer rights.

In 1891 the city limits were further extended along Jefferson Avenue to Hurlburt Avenue, which was the easterly line of the Township of Hamtramck. The railroad on Jefferson Avenue in the territory covered by this extension was constructed under franchises granted by the authorities of that township, respecting which no question is now raised.

From Hurlburt Avenue eastwardly to the Country Club in the Township of Grosse Pointe—a distance of about four and one-half miles—the railroad on Jefferson Avenue was constructed under several grants made by the Town-

ship and Village of Grosse Pointe, and the Village of Fairview, in the years 1891, 1893, and 1895, and further powers were conferred upon plaintiff in error, after its acquisition of these lines, by ordinance of the Village of Fairview passed May 16, 1905. These several village and township grants were for terms that have not yet expired, and contain provisions for five-cent fares within the territory covered by them.

The Jefferson Avenue lines are operated together as a single system in connection with lines leading from the city northwestwardly on Grand River Avenue to and beyond the city limits, constructed under rights derived by predecessors in title of plaintiff in error as follows:

By ordinance of May 1, 1868, the city granted to the incorporators of the Grand River Street Railway Company the right to construct lines on certain streets, including Grand River Avenue to its intersection with the Michigan Southern Railway at or near the then present city limits, with the right to build a second track within five years after the completion of the first. By § 8 this line was to be completed to a specified point contemporaneously with the paving of the street, and thence to the western city limits whenever public necessity, as determined by the common council, should require. By Acts of 1875 and 1885 the limits were extended from the railroad intersection to a point just beyond the Boulevard. By ordinance of August 3, 1888, there was granted the right to construct single tracks on Grand River Avenue from its then present terminus to the westerly city limits, and by ordinance of January 3, 1889, the city granted the right, among others, to construct a double track railway on Grand River Avenue from Woodward Avenue to the city limits, and under this authority tracks were built to the limits just beyond the Boulevard. The latter ordinance required the company to stipulate that it would sell tickets eight for twenty-five cents, good over the entire

route of the company, when offered during the morning and afternoon hours specified in the ordinance passed on the same date respecting the Detroit City lines and already referred to.

In 1897 the Township of Greenfield granted to the incorporators of the Grand River Electric Railway, (a different corporation from that last mentioned), a franchise for tracks along the Grand River Road from the westerly line of the township to the then present city limits of Detroit, with a right to charge not exceeding five cents as the fare for any distance in Greenfield, or six tickets for twenty-five cents, with school tickets at ten for thirty cents. Under this franchise a railroad was built along the Grand River Road from the then city limits near the Boulevard throughout the Township of Greenfield.

As already indicated, all of these lines of railway, with the appurtenant rights, privileges, and franchises, were acquired by plaintiff in error shortly after its incorporation, under the authority of § 15 of the Act of 1867.

Afterwards, by an act of the legislature approved October 24, 1907 (Mich. Laws, Ex. Sess. 1907, p. 55), a part of the former Village of Fairview, including Jefferson Avenue for a distance of about 12,500 feet northeastwardly from Hurlburt Avenue, was annexed to the City of Detroit. And by Acts of June 16, 1905, and June 19, 1907 (Mich. Local Acts 1905, p. 1144; Local Acts 1907, p. 940), the city limits were extended northwestwardly along Grand River Avenue for a distance of about one-half mile in territory previously part of Greenfield Township. Each of these acts provided that the annexed territory should be subject to all the laws of the State applicable to the city and to all the ordinances and regulations of the city, with exceptions not now material.

It is the contention of defendants in error that the provisions respecting fares in the two ordinances of January 3, 1889, assented to by the predecessors of plaintiff in error

in the ownership of the city lines on Jefferson and Grand River Avenues, were intended to be applicable throughout the city as it might from time to time be enlarged, and that plaintiff in error is bound by the limitations of those ordinances as to all its lines within the city, not only as its limits existed in 1889, but also including the territory annexed in 1905 and 1907.

In case No. 1, the Supreme Court of the State sustained the imposition of a fine for failure to accept workingmen's tickets, so called, within the hours prescribed by the ordinance of 1889 upon the Jefferson Avenue line within the territory formerly part of the Village of Fairview but annexed to the city by the Act of October 24, 1907. 162 Michigan, 460.

In No. 4, the court sustained a judgment awarding a mandamus requiring plaintiff in error to observe the provisions of the ordinances of 1889 upon the entire Jefferson Avenue—Grand River Avenue route, so far as included within the city limits as extended in 1907. 173 Michigan, 314.

In each case plaintiff in error seasonably and expressly insisted that the several township and village grants above referred to were subsisting and valid contracts when the legislature of Michigan passed the acts extending the city limits, and that those acts, if so construed or applied as to affect or modify the contracts, were in conflict with § 10 of Article I of the Constitution of the United States. And it is upon the overruling of these contentions that the cases are brought here, under § 237, Jud. Code.

Defendants in error challenge our jurisdiction, upon the ground that the judgments of the state court of last resort were based solely upon the meaning that it attributed to the ordinances of January 3, 1889, without reference to any subsequent legislation.

It is true, as this court has many times decided, that the "contract clause" of the Constitution is not addressed to

such impairment of contract obligations, if any, as may arise by mere judicial decisions in the state courts without action by the legislative authority of the State. *Cross Lake Shooting and Fishing Club* v. *Louisiana,* 224 U. S. 632, 639; *Frank* v. *Mangum,* 237 U. S. 309, 344.

But in this case there were state laws passed subsequent to the making of the alleged contracts in question, in the form of the legislation of 1905 and 1907 extending the corporate limits of the city. And it is not correct to say that the decisions of the state court turned upon the mere meaning of the contracts without reference to these subsequent laws. Assuming what in effect is conceded, that the village and township franchises constituted contracts within the protection of the Federal Constitution, the force of the decisions was to abrogate the rights acquired by plaintiff in error through its acquisition of the suburban lines, not merely because of the assent of the owners of the city lines to the ordinances of January 3, 1889, but because of the combined effect of those ordinances and the acts of the legislature of Michigan that thereafter extended the city limits. It is true that no question is or can be here made respecting the authority of the legislature to add new territory to the city; and it is likewise true that the annexation acts contain no reference to existing contracts, nor any specific mention of the subject-matter of street railway rights. But, in cases of this character, the jurisdiction of this court does not depend upon the form in which the legislative action is expressed, but rather upon its practical effect and operation as construed and applied by the state court of last resort, and this irrespective of the process of reasoning by which the decision is reached, or the precise extent to which reliance is placed upon the subsequent legislation. *McCullough* v. *Virginia,* 172 U. S. 102, 116, 117; *Houston & Texas Central R. R. Co.* v. *Texas,* 177 U. S. 66, 77; *Terre Haute &c. R. R. Co.* v. *Indiana,* 194 U. S. 579, 589; *Hubert* v. *New Orleans,* 215

U. S. 170, 175; *Fisher* v. *New Orleans*, 218 U. S. 438, 440; *Carondelet Canal Co.* v. *Louisiana*, 233 U. S. 362, 376; *Louisiana Ry. & Nav. Co.* v. *New Orleans*, 235 U. S. 164, 170. The necessary operation of the decisions under review is to give an effect to the annexation acts that substantially impairs the alleged contract rights of plaintiff in error as they theretofore stood; and it makes no difference that that result was reached in part by invoking the provisions of another agreement supposed to be binding upon plaintiff in error. Whether the agreement thus invoked, when properly construed, has the effect attributed to it, is a question that touches upon the merits, and not upon the jurisdiction of this court.

Coming, then, to the merits: Not only is it not disputed, but it is not open to serious dispute, that the original village and township grants were contractual in their nature. It appears that the recipients of those grants, like their successor, the plaintiff in error, became incorporated under the Street Railway Act of 1867, of which § 13 provides that consent for the construction and maintenance of a street railway is to be given by the corporate authorities in an ordinance to be enacted for the purpose, and under such rules, regulations, and conditions as may be prescribed by such ordinance, but that no such railway shall be constructed until the company shall have accepted in writing the terms and conditions upon which they are permitted to use the streets. By § 14, after any city, village, or township shall thus have consented to the construction and maintenance of street railways, or granted rights and privileges to the company, and such consent and grant shall have been accepted by the company, the consent shall not be revoked or the company deprived of the rights and privileges conferred. And by § 20 the rates of toll or fare to be charged by the company are to be established by agreement between it and the corporate authorities, and are not to be increased without consent of

such authorities: It is plain, as was pointed out by this court in *Detroit* v. *Detroit Citizens St. Ry. Co.*, 184 U. S. 368, 385, that the legislature regarded the fixing of the rate of fare as a subject for agreement between the municipality and the company. And in these cases, as in that, the terms of the several ordinances are such as clearly to import a purpose to contract under the legislative authority thus conferred.

But it is insisted—and to this effect was the decision of the state court—that the terms of these contracts were in effect modified by the assent of the owners of the city lines on Jefferson and Grand River avenues to the ordinances of January 3, 1889, and the subsequent acquisition of these lines by plaintiff in error followed by its acquisition of the suburban lines. It is, indeed, argued that the construction placed by the state court upon the ordinances of 1889 as contracts is not subject to the review of this court, and a declaration to this effect is cited from *Henderson Bridge Co.* v. *Henderson City*, 141 U. S. 679, 689, quoted in a subsequent case of the same title in 173 U. S. 592, 602. But, notwithstanding what was there said, it is too well settled to be open to further debate, that where this court is called upon in the exercise of its jurisdiction to decide whether state legislation impairs the obligation of a contract, we are required to determine upon our independent judgment these questions: (1) Was there a contract? (2) If so, what obligation arose from it? and (3) Has that obligation been impaired by subsequent legislation? *Houston & Texas Central R. R. Co.* v. *Texas*, 177 U. S. 66, 77; *St. Paul Gas Light Co.* v. *St. Paul*, 181 U. S. 142, 147; *Terre Haute &c. R. R. Co.* v. *Indiana*, 194 U. S. 579, 589.

But of course in the present cases the crucial question is, what were the obligations of the contracts as they stood at the time of the subsequent legislation? And therefore it becomes material to determine whether, by voluntary action of the parties between the making of the suburban

grants and the passage of the annexation acts, the obliga-
tions arising out of those grants had been modified.  The
state court deemed that the assent of the Detroit City
Railway to that provision of the first-mentioned ordinance
of January 3, 1889, which required it to carry passengers
at reduced rates "over any of its lines in said city" ap-
plied to any and all lines it either then owned or might
thereafter acquire, and comprehended all territory within
the limits of the city, including any extension of the
municipal boundaries or of the company's lines within
those boundaries; and that by the acquisition of the
lines of the Detroit City Railway plaintiff in error became
bound by this agreement, and was obliged to observe it,
even with respect to the lines that it afterwards acquired
as assignee of the Grosse Pointe and Fairview franchises,
so far as those lines were included in the extended city
limits.  It was said (162 Michigan, 462) that there were
two methods of extending street railways, one by con-
struction, the other by purchase under § 6448 (2 Comp.
Laws 1897), being § 15 of the Act of 1867; that "the pur-
chased railway becomes as much a part of the system as
does the railroad as constructed;" and that the ordinance
of 1889 was made in view of the power of the legislature
to increase or diminish the territory within the city, and
the real intent was to provide for single fares within the
city limits as they should from time to time be fixed.  In
173 Michigan, 314, similar reasoning was applied to the
ordinance of 1889 respecting the Grand River Avenue line
and the obligation imposed upon the owner of that line
to apply the single fare and the reduced rates "over the
entire route of said company."  The court considered
(173 Michigan, 325, 326) that certain of the language used
in the original ordinance of 1862 to the Detroit City Rail-
way and in that of 1868 to the Grand River Street Railway
Company showed that the probable growth of the city and
development of its public utilities were anticipated, and

indicated a purpose that the grants should apply as far as
the city might be extended.

Notwithstanding our disposition to lean towards con-
currence with the view of the state court of last resort in a
matter of this nature, we are unable to accept its con-
struction of the ordinances of 1889. In the first place, we
are unable to view the original ordinances as intended to
extend the rights of the respective grantees beyond the
then existing city limits and as far as the limits should be
extended in the future. Their language does not seem to
us to admit of this interpretation, and the practical con-
struction placed upon them by the parties was to the
contrary. As the city limits on Jefferson Avenue and on
Grand River Avenue were extended, the respective com-
panies obtained, and presumably were required to obtain,
new grants authorizing an extension of the railways from
their then present *termini* to the new city limits. Both of
the ordinances of 1889 contained express grants to this
effect with respect to Jefferson Avenue and Grand River
Avenue respectively. Each of the original city grants,
and each of the ordinances of 1889, contained particular
and comparatively brief limitations of time within which
the authorized lines of railway were to be constructed and
placed in operation. For these reasons, and because in
other respects the grants are quite specific in their terms,
and because the city at that time had no authority to
extend its corporate limits nor to make a grant of street
railway rights beyond them, we are compelled to conclude
that the ordinances of 1889 had no such extensive meaning
as that attributed to them by the state court.

Defendants in error invoke the established rule that the
terms of a municipal grant or franchise should be con-
strued strictly as against the grantee, and as favorably to
the grantor as its terms permit. The state court deemed
the rule to be applicable. 162 Michigan, 465; 173 Michi-
gan, 323. It is at least doubtful, however, whether the

rule, properly applied to the facts of these cases, does not bear altogether in favor of plaintiff in error. For of course it is not possible to adopt an extensive construction of the obligations imposed upon the city companies by the ordinances without adopting a like construction as to the extent of the franchises thereby conferred upon the companies. And can it be supposed that, if either of these companies had claimed the right to lay down tracks and operate railways in the annexed territory by virtue of the ordinances of 1889, they would not have been met with the rule that municipal grants are to be construed strictly against the grantee, and cannot be extended beyond their express terms? In any view, the ordinances, just because they were intended to be contracts, and not merely legislative enactments, ought to be regarded as having reference to a specific subject-matter.

But were we in error about the construction of these ordinances, we still think that the acquisition of the city lines by plaintiff in error, and its subsequent acquisition of the suburban lines, did not bind it to put the reduced fare provisions in effect upon the suburban lines if and when the city limits should thereafter be extended to include any parts of the latter. If the city lines had been extended into the annexed territory by either of the city railway companies under any authority conferred by or assumed under the ordinances of 1889, a very different question would be presented. But such is not the case. And although we may follow the state court to the extent of considering the acquisition of the suburban lines under § 6448, Comp. Laws, as being in effect an extension of the city railways, we cannot, without doing violence to the provisions of that section, regard such acquisition as abrogating any part of the franchise rights that pertained to the suburban lines; for the section itself declares that upon such purchase being made, the purchasing company "may use and enjoy the rights, privileges and franchises

of such company, the same, and upon the same terms as the company whose road and franchises were so acquired might have done." The rate of fare being among the most material and important of the terms and conditions referred to (*Detroit* v. *Detroit Citizens St. Ry. Co.*, 184 U. S. 368, 384; *Minneapolis* v. *Minneapolis Street Railway Co.*, 215 U. S. 417, 434), we find it impossible to regard the purchase of the suburban lines, with their rights, privileges, and franchises, as being in effect an extension of the city lines, but at the same time an abrogation of an essential part of the rights and privileges appurtenant to the acquired lines.

The state court cited and relied upon *Indiana Ry. Co.* v. *Hoffman*, 161 Indiana, 593, and *Peterson* v. *Tacoma Ry. & Power Co.*, 60 Washington, 406. In their particular facts and circumstances those cases differ somewhat from the cases now before us; and, without stopping here to analyze them, we deem it sufficient to say that we are unable to accept their reasoning so far as it is inconsistent with the views we have expressed.

It results that the provisions of the township and village ordinances respecting the rates of fare remained in full force and effect after the acquisition of the suburban lines by plaintiff in error, notwithstanding its previous acquisition of the city lines or the previous assent of the city railway companies to the ordinances of 1889. Because of the provision of § 10 of Article I of the Constitution of the United States, it was not within the power of the State of Michigan by any subsequent legislation to impair the obligations of those contracts, and since the judgments of the Supreme Court of that State gave such an effect to the annexation Acts of 1905 and 1907, in conjunction with the ordinances of 1889, as to impair those obligations, the judgments must be reversed.

We have made no particular mention of an agreement entered into between the city and plaintiff in error in the

year 1909, because we agree with the state court (173 Michigan, 321) that it was no more than a temporary provision for a *modus operandi*, and had not the effect of waiving any of the rights of either party.

　　*Judgments reversed, and the causes remanded for further proceedings not inconsistent with this opinion.*

MR. JUSTICE CLARKE, dissenting:

I greatly regret that I cannot concur in the decision just announced. The opinion of the majority of the court plainly regards the act of the legislature of the State of Michigan, extending the corporate limits of the City of Detroit, as a valid law, passed in the exercise of an undoubted power in the legislature to deal as it does with the municipal corporations of that State, and its validity for the purposes for which it was intended is not questioned. It will remain a valid law after this decision as it was before. In substance the decision of this court is that the Supreme Court of Michigan, in deciding that there is an implied condition in the contract between the City of Detroit and the railway company that the rates of fare therein provided for shall apply within the city limits when extended, and in requiring the railway company to accept the same fares throughout the new city limits as were accepted throughout the former limits, gives an effect to the extension act which impairs the railway company's contract with the city. I am of the opinion that for the state Supreme Court thus to interpret the terms of the contract of the railway company with the city is not to give an effect to the valid extension act of the legislature which violates the provision of the Constitution prohibiting a State from passing any "law impairing the obligation of contracts." The passing of the valid extension act merely created a situation under which the implied condition, *existing in the fare contract from its*

*beginning,* finds an application to the new territory. This is giving effect not to the terms of the act of the legislature but to the terms of the contract with the city, and the most that can be said against the decision of the Supreme · Court of Michigan is that it gives an erroneous construction to the contract. But since it is settled by many decisions of this court that the contract clause of the Federal Constitution does not protect contracts against impairment by the decisions of courts except where such decisions give effect to constitutions adopted or laws passed subsequent to the date of such contracts (*Cross Lake Shooting and Fishing Club* v. *Louisiana,* 224 U. S. 632), I am of opinion that there is no federal question before this court in this case and that the writ of error should be dismissed. This· is a high and delicate power which the court is exercising in this case and it should be resorted to only in cases which are clear, and, for the reasons thus briefly stated, I. am convinced that this is not such a case.

I am authorized to state that MR. JUSTICE BRANDEIS concurs in this dissent.