Johnson, J.
The grant involved in this case, in so far as it relates to the city of Cincinnati and Pleasant Ridge, was under investigation by this court in Interurban Railway & Terminal Co. v. City of Cincinnati, 93 Ohio St., 108. The syllabus *289 of that case is as follows: “An ordinance passed by a village council, granting a franchise to an interurban railway company to construct its line through the village, contained the following provision: ‘Should the village of Pleasant Ridge be annexed to the city of Cincinnati, the rate of fare charged for a ride in either direction between any point in said village and the Cincinnati terminus shall not exceed five cents.’' The company thereafter duly accepted the franchise and constructed, maintained and operated its line thereunder. Subsequently the village was annexed to the city. Held: The acceptance of the grant by the company constituted a binding contract between the parties. As long as the company retains the franchise and operates its road thereunder its terms must control.”
The other portions of the plaintiff in error’s line were constructed, maintained and operated under similar grants of franchises, which were accepted by the company.
The provisions of the General Code with reference to the power to fix the terms and conditions of such grants apply both to councils of municipalities and the commissioners of counties through which the lines run.
Section 3443, Revised Statutes, which was in effect at the- time of the making of these grants (and which is now Section 9113, General Code), provides that the “Council, or the commissioners, as the case may be, shall have the power to fix the terms and conditions upon which such railways *290 may be constructed, operated, extended, and consolidated.”
In the case above referred to it is said at page 122: “It is familiar law that when the terms of a valid ordinance are accepted by a grantee, such action constitutes a contract, and the rights of the parties are to be determined by the terms of the contract itself. City of Columbus v. Street Rd. Co., 45 Ohio St., 98; The Cincinnati & Springfield Ry. Co. v. Village of Carthage, 36 Ohio St., 631; The East Ohio Gas Co. v. City of Akron, 81 Ohio St., 33; City of Cleveland v. Cleveland City Ry. Co., 194 U. S., 517.”
In Cleveland v. Cleveland City Railway Co., 194 U. S., 517, the court says, at page 533:
“The statutes show that there was lodged by the legislature of Ohio in the municipal council of Cleveland comprehensive power to contract with street railway companies in respect to the terms and conditions upon which such roads might be constructed, operated, extended and consolidated, the only limitation upon the power being that in case of an extension or consolidation no increase in the rate of fare should be allowed.
“That in passing ordinances, based upon the grant of power referred to, the municipal council of Cleveland was exercising a portion of the authority of the State, as an agency of the State, cannot in reason be disputed. If, therefore, the ordinances passed after August, 1879, and referred to previously, which ordinances were accepted by the predecessors of the complainant, with whom it is in privity, constituted contracts in respect to the *291 rates of fare to be thereafter charged upon the consolidated and extended lines (affected by the ordinances) as an entirety, it necessarily follows that the ordinance of October, 1898, impaired these contracts.
“The question for decision then is Did the consolidated ordinance of February, 1885, and the ordinances thereafter passed and accepted, already referred to, constitute binding contracts in respect to the rates of fare to be thereafter exacted upon the consolidated and extended lines of the complainant ?
“That in the courts of Ohio the acceptance of an ordinance of the character of those just referred to is deemed to create a binding contract is settled. Railway Co. v. Village of Carthage, 36 Ohio St., 631, 634; City of Columbus v. Street Railroad Co., 45 Ohio St., 98. But let us consider the question without treating the Ohio decisions as conclusive.”
The federal supreme court then proceeds, in keeping with its rule, to determine for itself the existence or nonexistence of the asserted contract, and whether its obligation had been impaired. After this independent inquiry, the court arrived at the conclusion that there was a binding contract.
In this proceeding the public utilities commission is a party. Plaintiff in error rests on the proposition that authority has been conferred upon the commission to fix the rates to be charged by the complainant, notwithstanding, and in disregard of, the contract. It is contended that this may be done in the exercise of the police power of the state.
*292 Many authorities are cited in support of the proposition, which is familiar and well settled, that the state itself cannot, by contract, deprive itself of the proper exercise of the police power. Its elastic and undefined nature is everywhere recognized, as well as the limitations upon its exercise as against rights guaranteed and protected by the constitution.
In Walla Walla City v. Walla Walla Water Co., 172 U. S., 1, the grant of the right to supply water to a municipality and its inhabitants through pipes and mains laid in the streets upon the conditions named in the grant was held to be a contract protected by the federal constitution against state legislation to impair it. In the opinion it is said, at page 15:
“The argument that the contract is void as an attempt to barter away the legislative power of the city council rests upon the assumption that contracts for supplying a city with water are within the police power of the city, and may be controlled, managed or abrogated at the pleasure of the council. This court has doubtless held that the police power is one which remains constantly under the control of the legislative authority, and that a city council can neither bind itself, nor its successors, to contracts prejudicial to the peace, good order, health or morals of its inhabitants; but it is to cases of this class that these rulings have been confined.
“If a contract be objectionable in itself upon these grounds, or if it become so in its execution, the municipality may, in the exercise of its police power, regulate the manner in which it may be *293 carried out, or may abrogate it entirely, upon the principle that it cannot bind itself to any course of action which shall prove deleterious to the health or morals of its inhabitants. In such case an appeal to the contract clause of the Constitution is ineffectual. Thus in Fertilizing Co. v. Hyde Park, 97 U. S., 659, an act of the General Assembly of Illinois authorized the Fertilizing Company to establish and maintain for fifty years certain chemical works for the purpose of converting dead animals into agricultural fertilizers, and tó maintain depots in Chicago for the purpose of receiving and carrying out of the city dead animals and other animal matter which it might buy or own. Subsequently, the charter of the village of Flyde Park was revised, and power given it to define or abate nuisances injurious to the public health. It was held that under this power the village had the right to prohibit the carrying of dead animals, or offensive matter, through the streets; that the charter of the company was a sufficient license until revoked, but was not a contract guaranteeing that the company might continue to carry on a business which had become a nuisance by the growth of population around its works, or that it should be exempt for fifty years from an exercise of the police power of the State, citing Coates v. Mayor &c. of New York, 7 Cowen, 585.
“Substantially, the same ruling was made in Butchers’ Union Co. v. Crescent City &c. Co., 111 U. S. 746, wherein an act of the legislature of Louisiana, granting exclusive privileges for maintaining slaughter houses, was held to be subject to *294 subsequent ordinances of the city of New Orleans opening to general competition the right to build slaughter houses.
“The same principle has been applied to charters for the maintenance of lotteries which, upon grounds of public policy, have been held to be mere licenses and subject to abrogation in the exercise of the police power of the government; Boyd v. Alabama, 94 U. S., 645; Stone v. Mississippi, 101 U. S., 814; Douglas v. Kentucky, 168 U. S., 488; as well as to laws regulating the liquor traffic, Beer Co. v. Massachusetts, 97 U. S., 25; Metropolitan Board of Excise v. Barrie, 34 N. Y., 657; and even laws regulating the inspection of coal oil; United States v. DeWitt, 9 Wall., 41; Patterson v. Kentucky, 97 U. S., 501. In the latter case it was held that a person holding a patent under the laws of the United States for an invention was not protected by such patent in selling oil condemned by a state inspector as unsafe for illuminating purposes.
“Under this power and the analogous power of taxation we should have no doubt that the city council might take such measures as were necessary or prudent to secure the purity of the water furnished under the contract of the company, the payment of its just contributions to the public burdens, and the observance of its own ordinances respecting the manner in which the pipes and mains of the company should be laid through the streets of the city. New York v. Squire, 145 U. S., 175; St. Louis v. Western Union Tel. Co., 148 U. S., 92; Laclede Gas Light Co. v. Murphy, 170 U. S., 78. *295 But where a contract for a supply of water is innocuous in itself and is carried out with due regard to the good order of the city and the health of its inhabitants, the aid of the police power cannot be invoked to abrogate or impair it.”
And in Vicksburg v. Vicksburg Waterworks Co., 206 U. S., 496, it was held that a state may, in matters of proprietary rights, exclude itself and authorize its municipal corporations to exclude themselves, from the right of regulation of such matters as water rates. At .page 508 of the opinion, it is said: “That a State may, in matters of proprietary rights, exclude itself from the right to make regulations of this kind, or authorize municipal corporations to do so, when the power is clearly conferred, has been too frequently declared to admit of doubt.” (Citing authorities.)
In Home Telephone & Telegraph Co. v. City of Los Angeles, 211 U. S., 265, at page 273, it is said: “It has been settled by this court that the State may authorize one of its municipal corporations to establish by an inviolable contract the rates to be charged by a public service corporation (or natural person) for a definite term, not grossly unreasonable in point of time, and that the effect of such a contract is to suspend, during the life of the contract, the governmental power of fixing and regulating the rates. Detroit v. Detroit Citizens’ St. Ry. Co., 184 U. S., 368, 382; Vicksburg v. Vicksburg Water Works Co., 206 U. S., 496, 508. But for the very reason that such a contract has the effect of extinguishing pro tanto an undoubted power of government, both its existence and the *296 authority to make it must clearly and unmistakably appear, and all doubts must be resolved in favor of the continuance of the power.”
Plaintiff in error cites State, ex rel. Webster, v. Superior Court, 67 Wash., 37, and Puget Sound Traction Co. v. Reynolds, 244 U. S., 574, in support of its view. Both cases arose in the state of Washington. In the Puget Sound Traction case the federal supreme court shows that the constitution of Washington specifically limits the powers of cities touching the subjects here involved. Mr. Justice Pitney says at page 579: “The Constitution of Washington, Art. XII, § 18, requires the legislature to pass laws establishing reasonable maximum rates of charges for the transportation of passengers and freight, and to correct abuses and prevent discrimination in rates by railroads and other common carriers, and provides that ‘A railroad and transportation commission may be established, and its powers and duties fully defined by law.’ By Art. XI, § 10, any city containing a population of twenty thousand inhabitants or more is permitted to frame a charter for its own government ‘consistent with and subject to the constitution and laws of this state.’ This constitution was adopted in 1889, long previous to the date of the earliest of plaintiff’s franchise ordinances. The Supreme Court of Washington has held that the provisions of municipal charters are subject to the legislative authority of the State; that the Public Utilities Act superseded any conflicting ordinance or charter provision of any city; and that contractual provisions in franchises conferred by
*297 municipal corporations without express legislative authority are subject to be set aside by the exercise of the sovereign power of the State. Ewing v. Seattle, 55 Washington, 229; State ex rel. Webster v. Superior Court, 67 Washington, 37, 43-50.”
It will be observed that the Constitution of the State of Washington itself determined the question, and that the Ohio Constitution contains no such provisions.
The federal supreme court points out that the Washington cases are very clearly distinguishable from another recent case, Detroit United Ry. v. Michigan, 242 U. S., 238, 248. In that case franchises for city lines had been given by ordinances of Detroit. Franchises for suburban lines had been given by village and township ordinances which fixed the fares on a basis more favorable to grantees. Thereafter the limits of the city were extended so as to embrace parts of the outlying railways. The state courts held that the outlying lines, which were embraced within the extended limits, came also within the fares fixed by the city ordinances. At page 253, the federal supreme court says: “Because of the provision of § 10 of Article 1 of the Constitution of the United States, it was not within the power of the State of Michigan by any subsequent legislation to impair the obligations of those contracts, and since the judgments of the Supreme Court of that State gave such an effect to the annexation Acts of 1905 and 1907, in conjunction with the ordinances of 1889, as to impair those obligations, the judgments must be reversed.”
*298 The two recent cases from the United States supreme court, just cited, fairly comprehend and dispose of the questions here suggested.
The contract in this case is of harmless character, “innocuous in itself,” and is entitled to the constitutional protection.
As we have seen, it has been conclusively determined that in Ohio full authority had been conferred for the making of the contract. In addition to this the people by an amendment to the constitution have invested the municipalities of the state with plenary power to deal with the subject by binding contracts. Section 4 of Article XVIII provides that “Any municipality may acquire, construct, own, lease and operate within or without its corporate limits, any public utility the product or service of which is or is to be supplied to the municipality or its inhabitants, and may contract with others for any such product or service.” Therefore, the municipality does not now get its authority from the legislature, but from the constitution. The legislature cannot deprive it of that power.
The constitutional provision referred to was not adopted until after the making of the contract involved in this case, and the validity of that contract is of course to be determined by the law in effect at the time it was made. But inasmuch as under the authorities already cited the contract was valid and binding when made, we see no reason to deny to the municipality authority to insist upon its rights under the contract, now that its power to deal with the subject is sanctioned by the organic law.
*299 Moreover, we are not able to find that the legislature has attempted to confer upon the public utilities commission the authority to change rates fixed by contract between the company and local authorities.
It is contended that such authority has been conferred upon the commission by Section 524 et seq. of the General Code. Section 524 provides for the filing of a complaint before the commission of rates, fares, etc., that are alleged to be unreasonable or unjustly discriminatory. The succeeding sections provide that upon an investigation, if the rate or rates are found to be unreasonable or unjustly discriminatory, the commission may fix, and order substituted therefor, such rate or rates as it shall have determined to be just and reasonable. There is no provision in any of these sections which expressly authorizes the commission to change rates fixed by contract.
In the very recent case of Quinby et al. v. Public Service Commission, decided April 5, 1918, by the court of appeals of New York, 119 N. E., 433, the power of the public utilities commission of New York to change rates of a street railroad constructed under consent of the property owners and local authorities, where such consent was based upon a stipulated maximum fare, was attacked. Subdivision 1 of Section 49 of the Public Service Commission law of that state provides that whenever the commission shall be of opinion, after a hearing had upon its own motion or upon a complaint, that the rates, etc., charged for the trans *300 portation of persons or property by any common carrier, street railroad, etc., subject to its jurisdiction, are unjust, discriminatory or unduly preferential, it may determine the just and reasonable rates and fares thereafter to be observed. The constitution of New York, Article III, Section 18, provides that “no law shall authorize the construction or operation of a street railroad except upon the condition that the consent of the owners of one-half in value of the property bounded on, and the consent also of the local authorities having the control of, that portion of a street or highway upon which it is proposed to construct or operate such railroad be first obtained.” The section further provides that if consent cannot be obtained a proceeding may be conducted in court for'the determination of the subject.
The extent of the authority of the commission where a railroad was operated by the consent of the local authorities, as stated, was considered in that case, and it was held in paragraph 4 of the syllabus that “Under Const, art. 3, § 18, providing for consent of property owners and local authorities to the construction and operation of street railroads, where such consent was based upon a stipulated maximum fare, the public service commission is without jurisdiction over the subject-matter of changing such rate, and the law does not attempt to give it such authority.” It will be observed that the provisions of Subdivision 1, of Section 49, of the New York statute, are similar to those of the Ohio statute.
*301 The court, at page 437 of the opinion, says:
“In the absence of clear and definite language conferring, without ambiguity, jurisdiction upon the public service commission to increase rates of fare agreed upon by the street railroad and the local authorities, we should not unnecessarily hold that the Legislature has intended to delegate any of its powers in the matter, whatever its powers may be. The Public Service Commissions Law (sections 26, 49, subd. 1) and the Railroad Law (section 181) deal with maximum rates of fare established by statute, but make no reference in terms to rates established by agreement with local authorities.
“In regulating rates three courses were open to the Legislature: (1) To prescribe rates itself; (2) to delegate the power to the commission; (3) to leave the matter to agreement between the street railroad company and the local authorities. It has constitutionally conferred on the public service commission certain functions [Citing authorities], which plainly include the power to regulate rates fixed by statute; and while it may be said that it has undertaken to delegate to the public service commission ‘the same power’ that it has to regulate rates of fare (Railroad Law, § 181), it is impossible to find a word in the statutes which discloses the legislative intent to deal with the matter of rates fixed by agreement with local authorities. As it has often been held in connections other than that of legislative power over them that such agreements are valid, it may well be inferred that the *302 Legislature excluded them from consideration by failure to mention them, and that it has made no attempt to turn' them over to the public service commission for revision.”
This reasoning applies with singular force to the situation in Ohio and to the question we have here.
The public utilities commission of Ohio is created, and its duties defined, by statute. In the recent case of City of Cincinnati v. Public Utilities Commission, 96 Ohio St., 270, it is declared in the syllabus: “The powers of the public utilities commission are conferred by statute and it possesses no authority other than that thus vested in it.” The general assembly not having provided that the commission may interfere with valid and binding contracts, we may well conclude that it excluded them from consideration.
In cases such as we have here it is a prerequisite of the grant to the company that a certain proportion of the abutting property owners shall first consent. And the statute requires that a municipality shall award the franchise to the bidder who proposes to carry passengers on the route for the lowest rate of fare, after public advertisement. The presumption is that such consents are given in consideration of the terms of the grant to be complied with by the company, including the rate of fare agreed on. It would not only be a vain and empty arrangement, but a deceptive one, if these provisions could be disregarded and the company nevertheless, retain and exercise all of the valuable *303 rights and privileges granted to it in consideration thereof.
The order of the commission will be affirmed.

Order affirmed.

Nichols, C. J., Wanamaker, Newman, Matthias and Donahue, JJ., concur.