Argued June 21, affirmed July 23, 1918.

## PORTLAND *v.* PUBLIC SERVICE COMMISSION.*

(173 Pac. 1178.)

Carriers—Public Service Commission—Change of Rates—Proceedings.

1. The fact that proceedings of the Public Service Commission of Oregon increasing the rate of fare charged by a street railway were not instituted by the state does not affect validity thereof; the commission being allowed by Section 45 of the act creating it (Laws 1911, p. 483) to act on its own motion, by Section 46 on petition of the public utility itself, and by Section 41 on complaint of any three persons, firms, corporations or associations, or any mercantile, agricultural or manufacturing society, or any political organization.

[As to validity of regulation fixing minimum rate to be charged by public service corporation, see note in Ann. Cas. 1916A, 933.]

Municipal Corporations—Grant of Franchise—Acceptance—"Grant."

2. Under Portland City Charter, Section 94, giving city council the right to grant a franchise, the franchise does not become operative until grantee has accepted; the word "grant" implying offer by city and acceptance by company.

Constitutional Law—Police Power.

3. Police power is not restricted to public peace, health and safety, but covers the general welfare of the people; Article I, Section 1, of the Constitution, stating that governments are instituted for the peace, safety, and happiness of people.

*Authorities discussing the question of right to raise rates of public service corporations fixed by franchise are collated in a note in L. R. A. 1915C, 287.                REPORTER.

Corporations—Public Service—Regulation of Rates.

4. It is primarily the duty of the State, in the interests of the public, to see that all concerns that serve the public be content with and are entitled to receive reasonable compensation for their services.

Carriers—Regulation of Rates—Police Power.

5. Regulation of rates of the fares of a street railway is within the police power of the state.

Municipal Corporations—Franchise—Right to Make.

6. A city's right to grant franchise to street railway was as an agent of the state.

Constitutional Law — Impairing Right to Contract — Franchise—Carrier's Charges.

7. Order of Public Service Commission, changing rate of fare provided for by franchise granted street railway by city, is not void for impairment of contract rights, as the state, having granted franchise through the city as its agent, has right to change the provisions thereof through its representative, the Public Service Commission.

Constitutional Law — Due Process of Law — Changing Carrier's Charges.

8. Public Service Commission's order changing the rate of fare provided for in street railway franchise granted is not void, because of depriving the city and its inhabitants of property and rights without due process of law, as the state, having granted franchise through city as its agent, has right to modify franchise by changing the rate of fare through its representative, the Public Service Commission.

Carriers—Regulating Rates—Cities—Public Service Commission.

9. City's authority to represent the state in regard to the fares of a street railway, which had been given a franchise, was annulled by act creating Public Service Commission, and such authority given to such commission, who as state's agent could agree to change in the franchise allowing company an increased rate of fare.

Carriers—Statutory Regulation—Creation of Public Service Commission—Retroactive Effect.

10. Order of Public Service Commission is not void, because the fare changed was agreed on by a franchise entered into prior to the enactment of the law creating the commission; the law being designed to deal with conditions as they arise.

From Multnomah: Judges JOHN P. KAVANAUGH, ROBERT G. MORROW, ROBERT TUCKER, GEORGE W. STAPLETON, WILLIAM N. GATENS and CALVIN U. GANTENBEIN Sitting in Banc.

In Banc.

The City of Portland, a municipal corporation, instituted this suit against the Portland Railway, Light

and Power Company, a corporate concern operating a street railway in that city, and thereby seeks to nullify an order made by the defendant, the public Service Commission of Oregon, allowing the company to charge six cents for the transportation of each person over its lines in the same general direction, instead of five cents as prescribed by an ordinance enacted by the council of the plaintiff and conferring upon the company the franchise under which it operates. A general demurrer to the complaint was sustained by the circuit judges in Multnomah County sitting in banc. The city appealed. AFFIRMED.

For appellant there was a brief over the names of *Mr. Walter P. La Roche,* City Attorney, *Mr. Martin L. Pipes, Mr. H. M. Tomlinson* and *Mr. Wilson T. Hume,* with oral arguments by *Mr. La Roche* and *Mr. Pipes.*

For respondent, Public Service Commission, there was a brief over the names of *Mr. George M. Brown,* Attorney General, and *Mr. John O. Bailey,* Assistant Attorney General, with an oral argument by *Mr. Bailey.*

For respondent, Portland Railway, Light & Power Company, there was a brief over the names of *Mr. Frederick V. Holman, Messrs. Griffith, Leiter & Allen* and *Mr. W. C. Benbow,* with oral arguments by *Mr. Holman* and *Mr. Rufus A. Leiter.*

BURNETT, J.—The essence of the dispute presented in this litigation is whether upon the application of a public service corporation like the company the Public Service Commission of the state had the authority to change the rate of fare prescribed by the city ordinances giving the company the right to oper-

ate street railways in the City of Portland. The proper disposition of this suit depends upon the solution of that question of jurisdiction. We are not concerned with the wisdom of the commission's decision. Whether it acted wisely or not in increasing the rate of fare is not for our decision in this case on demurrer to the bill. If we find that it had jurisdiction to make the change, our quest is ended.

The charter under which the City of Portland operates was embodied in an act of the legislative assembly approved January 23, 1903, and approved by a popular vote of the citizens of that municipality. Section 3 of that act declares that the city

"shall be invested within its limits with authority to perform all public services and with all governmental powers, except such as are expressly conferred by law upon other public corporations and subject to the limitations prescribed by the constitution and laws of the state, except as hereinafter provided."

Respecting the grant of franchises, the authority therefor is found in Section 94, reading thus:

"The council may, subject to the limitations and conditions contained in this charter, grant, for a limited time, specific franchises or rights in or to any of the public property or places mentioned in the preceding sections. Every such grant shall specifically set forth and define the nature, extent and duration of the franchise or right thereby granted, and no franchise or right shall pass by implication. At all times the power and right reasonably to regulate in the public interest the exercise of the franchise or right so granted shall remain and be vested in the council, and said power and right cannot be divested or granted."

The next following section limits to a period of twenty-five years the time for which a franchise may be granted and requires that the amount and manner

of compensation to be paid by the grantee shall be fixed and gives the right to the city to purchase the business and property at the expiration of the grant, if authorized by the voters of the city. A provision is also made for fixing the method of ascertaining the value of the property thus to be acquired by the municipality.

The legislative assembly of this state afterward passed the act of February 24, 1911, entitled:

"An Act to define public utilities, and to provide for their regulation in this State, and for that purpose to confer upon the Railroad Commission of Oregon power and jurisdiction to supervise and regulate such public utilities, and providing the manner in which the power and jurisdiction of such Commission shall be exercised, prescribing penalties for the violation of the provisions of this Act and the procedure and rules of evidence in relation thereto, making an appropriation to carry out the provisions hereof, amending Section 2 of Chapter 53 of the Laws of Oregon for the year 1907, the same being Section 6876 of Lord's Oregon Laws, and declaring an emergency."

By proper legislation the Railroad Commission referred to in the act has since been denominated the Public Service Commission. Among other things, any plant or equipment used for the transportation of persons or property by street railways as common carriers is defined by the statute to be a public utility. Section 6 of the law vested the commission "with power and jurisdiction to supervise and regulate every public utility in this state and to do all things necessary and convenient in the exercise of such power and jurisdiction."

Section 7 in part reads thus:

"Every public utility is required to furnish adequate and safe service, equipment and facilities, and

the charges made by any public utility for any * * transportation of persons or property by street railroad, or for any service rendered or to be rendered in connection therewith shall be reasonable and just and every unjust or unreasonable charge for such service is prohibited and declared to be unlawful.''

It is said in Section 33:

''The commission shall provide for a comprehensive classification of service for each public utility and such classification may take into account the quantity used, the time when used, the purpose for which used, and any other reasonable consideration.   Each public utility is required to conform its schedules of rates, tolls and charges to such classification.''

In Sections 41 to 46, inclusive, it is laid down that the commission may prescribe reasonable rates, etc., after a hearing either on the complaint of any mercantile, agricultural or manufacturing society or by any body politic or municipal organization or by any three persons, firms, corporations or associations (Section 41); or on its own motion (Section 45); or on the petition of the public utility itself (Section 46). Section 51 empowers the commission after investigation to order the substitution of reasonable rates and charges instead of those which it shall find to be unjust or unreasonable, and, by the following section, it may afterward revise its own decision.   Under Section 54, any public utility or other person, persons or corporation interested in, or affected by, any order of the commission fixing any rates, tolls, charges, schedules and so forth, may sue in the county where the hearing was held, to set aside the order on the ground that it is unlawful.   It is said substantially in Section 61 that every municipality shall have power to determine by contract, ordinance or otherwise the quality and character of service furnished by any public util-

ity within the municipality, and all other terms not inconsistent with the act upon which it may occupy the streets with its plant, and such contract, ordinance or other determination shall be in force and *prima facie* reasonable, but upon complaint made by the public utility, or any other qualified complainant, the commission shall hear and determine the question and after it finds the same to be unreasonable the contract, ordinance or other municipal determination shall be void:

"*Provided, however,* that no ordinance or other municipal regulation shall be reviewed by the commission under this section which was prior to such review enacted by the initiative or which was prior to such review referred to and approved by the people of said municipality or while a referendum thereon is pending."

In substance, it is stated in the complaint that since the adoption of the public utilities statute the City of Portland, operating by the initiative process, amended its charter so as to assume, so far as it had power so to do, the right to regulate and prescribe rates, and other matters, practically the same as the Public Service Commission. It does not appear, however, in that pleading that the city ever attempted to pass any ordinance changing the previously granted franchise of the company, and it is sufficient to say in this connection that the only acts of the city sought to be reviewed by the commission in this instance were the ordinances passed by the common council. These were never referred to the people for their approval and were not the subject of the initiative process. Plainly they are not within the restriction of the quoted proviso.

1, 2. The complaint urges that the State of Oregon did not institute the proceeding whereby the rate of fare was increased from five to six cents. This conten-

tion is without merit, for the act of 1911 creating the commission allows it to act on its own initiative, as well as upon the petition of the public utility itself or of certain other persons already mentioned. It is also said that the action of the commission is void because it violated the constitutional provisions forbidding any state to impair the obligation of a contract, and that it deprived the City of Portland and its inhabitants of their property and rights without due process of law. This presents the principal question for consideration. It is urged that the ordinances under which the railway company and its predecessors in interest have acted were offers to them which they were required to, and did, accept before proceeding to operate their plant, and that this constituted a contract between the City of Portland and the company which cannot be violated by any subsequent legislation. In support of its contention in this respect, the city cites *Cleveland* v. *Cleveland City Ry. Co.,* 194 U. S. 537 (48 L. Ed. 1102, 24 Sup. Ct. Rep. 756), *Detroit* v. *Detroit Citizens' Street Ry. Co.,* 184 U. S. 368 (46 L. Ed. 592, 22 Sup. Ct. Rep. 410), and *Detroit United Rys.* v. *Michigan,* 242 U. S. 238 (61 L. Ed. 268, 37 Sup. Ct. Rep. 87). In all those cases the state had expressly and literally authorized the municipality in so many words to adjust the matter by contract. The Portland charter under consideration says nothing about a contract, but speaks of a grant and requires legislative action. True it is that the franchise does not become operative until the grantee has accepted. The term "grant" implies offer of the city and acceptance by the company, for the municipality cannot fashion a grant and compel anyone to accept it. The distinction is too finely drawn whereby government control of rates according to reasonableness is applicable to the so-called

"grant" cases and withheld from those which may be called "contract" cases. But all of such conventions, whether of pure contract or by public grant, are made subject to the ever-present principles that the charges shall be fair and reasonable and that the right to adjust them is primarily a prerogative of the state.

3–5. The argument of the plaintiff is that the public peace, health and safety comprise the sole objects of the police power of the state; that these are not affected by the rate of fare to be charged by a street-car company, and hence that the police power is not available to modify the rates. But, as held in *Woodburn* v. *Public Service Commission*, 82 Or. 114 (161 Pac. 391, Ann. Cas. 1917E, 996, L. R. A. 1917C, 98), the police power is not restricted to such narrow limits. As stated in Article I, Section 1, of our state Constitution, governments are instituted for the peace, safety and happiness of people. In other words, the general welfare of the people is within the police power of the government and one of the peculiar objects of its care. The discussion of the plaintiff omits all consideration of the principle that it is primarily the duty of the state, in the interests of the public, to see that all concerns that serve the public be content with, and also are entitled to receive, reasonable compensation for their services: 10 C. J. 411. All rate regulations depend upon this principle. Reasonableness is the pole-star in all investigations of the subject. Conditions change and what was reasonable twenty years ago may be unreasonably high or unreasonably low to-day. The question to be decided is: Who shall determine this, and is the contract subject to revision in that respect?

6. Considering the matter as one of contract, we find the doctrine thus stated in *Cleveland* v. *Cleveland City*

*Ry. Co.,* 194 U. S. 537 (48 L. Ed. 1102, 24 Sup. Ct. Rep. 756), relied upon by the plaintiff:

"That passing ordinances based upon the grant or referred to the municipal council of Cleveland was exercising a portion of the authority of the state, as an agency of the state cannot in reason be disputed."

So, in this instance, the state in the exercise of its legislative power created the City of Portland its agent for the purpose of initiating an arrangement whereby the company could operate its cars and charge a compensation therefor within the city. The state might have appointed any other agency to work out the same result. It did not in any sense surrender its right to recall that agency and confer it upon another. It did not in any manner, nor could it, abdicate its authority under the police power to enforce a reasonable rate of fare as against the stipulations of contracting parties. That the regulation of rates is a prerogative of the state as to carriers operating wholly within its borders is taught in *Simpson* v. *Shepard,* 230 U. S. 352 (Ann. Cas. 1916A, 18, 48 L. R. A. (N. S.) 1151, 57 L. Ed. 1511, 33 Sup. Ct. Rep. 729). The legislature in delegating this authority to the city by the 1903 charter did not, nor could it, undertake to control the future legitimate exercise of the law-making power. The authority to delegate involves the power to revoke. That this may not be done in this instance by special law enacted by the legislative assembly amounting to a direct amendment of the Portland charter is granted; but that a general law of paramount authority over all municipal charters constitutionally may be enacted by the legislative assembly is taught in *Rose* v. *Port of Portland,* 82 Or. 541 (162 Pac. 498). Covering the whole field of public utilities throughout the state as it does, except those owned

by municipalities, the statute under which the commission acts operates to transfer the agency in that matter from the city to the commission, annulling the authority of the former. The case of the plaintiff is not aided by the subsequent amendments to the charter whereby the effort was to invest the municipality with substantially all the authority over public utilities operating within the city that was conferred upon the commission. There are two reasons for this. One is that although the city by these changes in its organic law asserted the right to regulate rates, it has not exercised the right. Another is that the scope of the initiative and referendum power vested in the legal voters of municipalities is confined to "local, special and municipal legislation": Article IV, Section 1a, state Constitution. This section explains and limits the language of Section 2 of Article XI of the same instrument authorizing the legal voters of cities and towns "to enact and amend their municipal charter subject to the constitution and criminal laws of the State of Oregon," with the result that the city is debarred from assuming on its own initiative a power which is peculiarly a prerogative of the state itself. Regulation of rates is such a power. It affects the general public and not merely the inhabitants of any single city, and never could have been exercised by the plaintiff unless delegated to it by the state. The constitutional provisions for "local, special and municipal legislation" by the initiative were never intended as permission to cities and towns to arrogate to themselves powers otherwise primarily resident in the state. All authority whatever possessed by cities and towns emanated from the state. They cannot further invade its original sovereign prerogative unless the attempt is referable to "local, special and munici-

pal legislation.'' The state, operating through its legislative assembly or directly by its people, exercising the initiative, is still paramount in the matter of making laws. It can delegate authority to its subordinate governmental agencies and it can revoke it. Moreover, all that is done under the appointment is subject to the ever-present and all-pervading principle that for the public good the state may control all stipulations for public service. Substantially this is a condition of every such agreement.

7–9. On the basis of contract the situation then presented is this: the state, acting by and in the name of its agent, the city, made an agreement with the company. It later created the Public Service Commission, giving it general authority over all such and kindred matters everywhere in Oregon except as stated. By this legislation there came into existence a new representative of the state endowed by it with plenary power and to which the other party to the so-called agreement applied for a modification thereof. After investigation and deliberation which may be likened to negotiations between contracting parties, the state by its agent, the commission, has consented to a change in the contract, allowing the company to charge an increased rate of fare. Whatever might be said if one of the parties to the contract without the consent of the other should attempt to change it, whether by legislation impairing the obligation of the contract or otherwise, it does not apply to the present situation, for, as stated, the contracting parties have themselves agreed to the change.

10. Finally, the complaint urges that the order of the commission is void because the public utilities act is not retroactive. This contention may be dismissed with the statement that the law does, and is designed to, deal with conditions as they arise and to adjust

matters relating to concerns serving the public from time to time as may be required.

The principal features of the instant case are controlled by *Woodburn* v. *Public Service Commission,* 82 Or. 114 (161 Pac. 391, Ann. Cas. 1917E, 996, L. R. A. 1917C, 98). The voluminous briefs and multitude of precedents cited by industrious counsel have been carefully examined and we discern no reason for changing the rule announced in that case. Substantially the same conclusion was reached by the Supreme Court of Montana in *State ex rel.* v. *Billings Gas Co.,* 173 Pac. 799, decided June 24, 1918, and not yet reported officially. Other cases, among still other numerous precedents which might be cited, will aid in the investigation of the question and are here noted: *Worcester* v. *Worcester Consol. St. Ry. Co.,* 196 U. S. 539 (49 L. Ed. 591, 25 Sup. Ct. Rep. 327); *Hudson County Water Co.* v. *McCarter,* 209 U. S. 349 (14 Ann. Cas. 560, 52 L. Ed. 828, 28 Sup. Ct. Rep. 529); *Home Telephone & Telegraph Co.* v. *Los Angeles,* 211 U. S. 265 (53 L. Ed. 176, 29 Sup. Ct. Rep. 50); *Louisville & Nashville R. R. Co.* v. *Mottley,* 219 U. S. 467 (34 L. R. A. (N. S.) 671, 55 L. Ed. 297, 31 Sup. Ct. Rep. 265); *Portland Ry., Light & Power Co.* v. *Railroad Commission,* 229 U. S. 397 (57 L. Ed. 1248, 33 Sup. Ct. Rep. 820); *Board of Survey* v. *Bay State Street Ry. Co.,* 224 Mass. 463 (113 N. E. 273); *Benwood* v. *Public Service Commission,* 75 W. Va. 127 (83 S. E. 295; L. R. A. 1915C, 261, and notes); *Pinney & Boyle Co.* v. *Los Angeles Gas & Electric Corp.,* 168 Cal. 12 (141 Pac. 620, Ann. Cas. 1915D, 471, L. R. A. 1915C, 282); *State ex rel. Webster* v. *Superior Court,* 67 Wash. 37 (120 Pac. 861, Ann. Cas. 1913D, 78, L. R. A. 1915C, 287).

The Circuit Court was right in dismissing the bill and its decision is affirmed.          AFFIRMED.